**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Elizabeth P. CASTANEDA Defendant–Appellant.**

No. 00–10204.

United States Court of Appeals, Ninth Circuit.

Submitted Dec. 13, 2000[1]

Filed Feb. 2, 2001

Peter C. Perez, Hagatna, Guam, for the defendant-appellant.

Gregory Baka, Assistant United States Attorney, Saipan, MP, for the plaintiff-appellee.

Before: MYRON H. BRIGHT,[2] REINHARDT, and SILVERMAN, Circuit Judges.

Opinion by Judge REINHARDT; Dissent by Judge SILVERMAN

---

1. The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed. R.App. P. 34(a)(2).

2. The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

REINHARDT, Circuit Judge:

Defendant–Appellant Elizabeth Castaneda appeals the sentence imposed following her guilty plea to one count of transportation of persons for illegal sexual activity in violation of the Mann Act, 18 U.S.C. § 2421. Castaneda contests the district court's imposition of a two-level "vulnerable victim" enhancement under § 3A1.1(b) of the Sentencing Guidelines. Adopting the approach taken by the First Circuit in a similar case involving the application of § 3A1.1(b) to the Mann Act, we hold that the district court erred in applying the enhancement.

## BACKGROUND

Castaneda co-owned the Mood & Music Night Club in Saipan, Commonwealth of the Northern Mariana Islands, and recruited waitresses and singers for her club from the Phillippines. In 1997, three women (referred to throughout by their initials, B.G.S.N., O.S.G., and L.V.S., to protect their privacy) were hired at Castaneda's recruiting office in the Philippines for jobs in the club ranging from waiting tables to singing. Castaneda personally interviewed and hired B.G.S.N. and participated in the hiring of the other women. Castaneda told the applicants that the job included "greeting customers at the door of the club with a kiss, sitting with the customers, and perhaps holding their hands." The women were offered a salary of $3.05 per hour and a one-year contract in exchange for a placement fee of 15,000 pesos (approximately $500). The women signed a booklet entitled "Personnel Rules and Policies," which prohibited the employees from engaging in prostitution and stated that any employee who resigned prior to the expiration of the contract would bear the cost of the return airline fare back to the country of origin.

B.G.S.N. arrived in Saipan on July 5, 1997; O.S.G. and L.V.S. arrived on July 24. According to the plea agreement:

B.G.S.N and the other women employees were forced to line up for selection by male customers to accompany them to private "VIP rooms." There, the waitresses and singers employed at "Mood and Music" were made to provide sexual services, as defined in Title 6, Commonwealth Code, Section 1341(e), for the customers, namely the "touching of any person by oneself or another, for the purpose of sexual arousal or gratification, aggression, degradation, or other similar purpose."

The men who chose to use these rooms were required to pay $5.00 per hour and to purchase drinks which were delivered every twenty minutes by the unselected waitresses. According to the plea agreement, B.G.S.N. and the other women complained on several occasions to the manager of the night club and to Castaneda that "the men were groping them in the private 'VIP rooms,' and that this was not what they were hired to do," but to no avail. The three women stopped working at the Mood and Music Nightclub in August, 1997, when B.G.S.N. filed a complaint with the FBI.

On November 13, 1997, Castaneda was indicted for the transportation of B.G.S.N., O.S.G., and L.V.S. for purposes of criminal sexual activity in violation of the Mann Act, 18 U.S.C. § 2421. On October 21, 1998, Castaneda pleaded guilty to the count of the indictment relating to B.G.S.N. In the plea agreement, the defendant and the government stipulated that other than adjustments for her role as an organizer and for acceptance of responsibility, and a possible downward departure for substantial assistance to the government, no other adjustments were appropriate. The plea agreement thus contemplated a total offense level of 13. In its Presentence Investigation Report (PSR), however, the U.S. Probation office recommended an additional two-level vulnerable victim enhancement pursuant to U.S.S.G. § 3A1.1(b).

Castaneda was sentenced on April 4, 2000. The district judge denied Castaneda's motion objecting to the imposition of

the vulnerable victim enhancement and stated,

> I do believe that these victims were particularly vulnerable. They had left their home in the Philippines. Some of them were married with children. And the reason they left home and their loved ones was to come to Saipan to get a job to be able to send money back home, and support their family. And in doing that, they borrowed great sums of money 15,000 pesos to finance this. So I think that they were vulnerable. They couldn't just pack up and go home. They financially were vulnerable to the position of the defendant in this case.

Including the two-level vulnerable victim enhancement, the district court determined that the total offense level was 15, resulting in a guideline range of 18 to 24 months. Castaneda received a downward departure from the guideline range of her offense for substantial assistance to the authorities, and was sentenced to 12 months imprisonment.[3] Castaneda timely appealed her sentence.

## STANDARD OF REVIEW

 In a challenge to a victim-related adjustment, this court reviews a district court's construction, interpretation, and application of the Sentencing Guidelines de novo. *United States v. Castellanos*, 81 F.3d 108, 109 (9th Cir.1996). Related factual findings are reviewed for clear error. *Id.*

## DISCUSSION

Section 3A1.1(b) of the Sentencing Guidelines calls for a two-level increase "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b) (1998). The commentary accompanying this section defines a "vulnerable victim" as one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the

criminal conduct." U.S.S.G. § 3A1.1, cmt. n. 2. The Application notes further explain:

> Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

U.S.S.G. § 3A1.1, cmt. n. 2.

The theory behind the vulnerable victim enhancement is that conduct against the particular victim or group of victims is more blameworthy than the conduct of other offenders and thus deserves greater punishment. *See United States v. Castellanos*, 81 F.3d 108, 111 (9th Cir.1996) (holding that the enhancement is warranted where conduct against the victims "render[s] the defendant's conduct more criminally depraved."). Section 3A1.1(b), in effect, "codifies judicial discretion to impose harsher sentences on defendants who commit similar crimes, but whose choice of victim identifies them as deserving greater punishment." John Garry, "Why Me? Application and Misapplication of § 3A1.1" 79 *Cornell L.Rev.* 143, 147 (1993).

 An unusually vulnerable victim is one who is "less able to resist than the typical victim of the offense of conviction." *United States v. Wetchie*, 207 F.3d 632, 634 (9th Cir.2000). We recently noted that "[t]he appropriateness of conceptualizing the vulnerable adjustment in terms of victims who are more vulnerable than

---

**3.** If the vulnerable victim enhancement had not been applied, Castaneda would have had a total offense level of 13, with a guideline range of 12 to 18 months, prior to the downward departure.

the usual victims of the offense is confirmed by the rule that the adjustment should not apply when vulnerability is already reflected in the offense guideline." *See Wetchie,* 207 F.3d at 634 n. 4. If the factor that makes the victim vulnerable is not "unusual" for victims of the offense, the § 3A1.1(b) enhancement is not permitted.[4] Thus, for example, in *United States v. Fontenot,* 14 F.3d 1364 (9th Cir.1994), we held that the district court erred in applying § 3A1.1 to a defendant who hired an assassin to kill his wife in violation of 18 U.S.C. § 1958, the federal statute prohibiting interstate travel or use of the mail in relation to a murder for hire. The district court imposed the vulnerable victim enhancement because the defendant gave the hit man information about his wife's lifestyle, personal habits, and health problems. We found that § 3A1.1 did not apply because the victim "was no more vulnerable than any other intended victim of a murder for hire," noting that "[a]ny person contracting for a murder for hire is likely to know the intended victim well." *Id.* at 1373.

In *United States v. Sabatino,* 943 F.2d 94 (1st Cir.1991), the First Circuit specifically addressed the application of the vulnerable victim enhancement to the prostitution provision of the Mann Act.[5] We adopt the well-reasoned analysis of the First Circuit. In *Sabatino,* the district court applied § 3A1.1 to the sentences of a husband and wife team convicted of violating the Mann Act by running an interstate escort service. The district court based the enhancement on its finding that of the prostitutes employed by the Sabatinos, some were only teenagers, two were mothers of small children, and many were out of work and in need of a job. *Id.* at 103. The First Circuit held that the vulnerable victim enhancement did not apply because the Sabatinos' victims were not unusually vulnerable "given the kind of victim that is typically involved in a Mann Act violation and that Congress aimed to protect." *Id.* at 103. The *Sabatino* court discussed the legislative history of the Mann Act at length and concluded that "the Act embodied a paternalistic attitude concerned with the protection of women and girls who,

---

4. Section 3A1.1 does not, however, require that the victims be more vulnerable than the typical victims of the particular *scheme* or type of *scheme* that is utilized. Thus, the commentary anticipated application in instances "where the defendant marketed an ineffective cancer cure." U.S.S.G. § 3A1.1 cmt. (n.2). We have noted that "nowhere in the cancer example does it state that any individual victim purchasing such a cure must be unusually vulnerable beyond the fact that he has cancer and is seeking a cure. In other words, the Guidelines deem cancer patients, as a group, to be unusually vulnerable vis a vis the general public to snake oil salesmen promising cancer cures." *United States v. O'Brien,* 50 F.3d 751, 757 (9th Cir.1994) (quoting *United States v. Brown,* 7 F.3d 1155, 1161 n. 3 (5th Cir.1993)). The enhancement would apply in such a case because cancer patients are more vulnerable than the general public to the statutory *offense* of medical insurance fraud, but there is no need to show that any of the victims are more vulnerable than the typical cancer patients who would ordinarily be the victims of the specific *scheme* of marketing fake cancer cures. If, however, the statutory offense were "marketing cancer cures," then the fact that a cancer

patient was the object of the fraud would not justify imposition of the vulnerable victim enhancement. *See* U.S.S.G. § 3A1.1 cmt. (n.2) (stating that the enhancement does not apply "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline.").

5. *Sabatino* is the only circuit opinion to discuss the application of the vulnerable victim enhancement to 18 U.S.C. § 2421, the adult prostitution provision of the Mann Act. *United States v. Johnson,* 132 F.3d 1279 (9th Cir. 1997), involved a different provision of the Mann Act, 18 U.S.C. § 2423, which prohibits transportation of a minor with intent to engage in sexual activity. In *Johnson,* we held that a Norwegian boy in a school exchange program molested by his American host parent was a vulnerable victim for the purposes of § 3A1.1. The court in *Johnson* made an individualized assessment of the boy's circumstances and found that a number of factors, such as his isolation, cultural ignorance, and the fact that the molester was his host parent, rendered him unusually vulnerable. *Id.* at 1285–86. The factors relied on by the *Johnson* court are thus clearly not typical of victims of the offense there in question.

because of their innocence, their hard lives, and their vulnerability, were particularly susceptible to becoming victims of unscrupulous men and women who would take advantage of their situation for immoral purposes." *Id.*[6] The First Circuit concluded that the "vulnerable" factors suggested by the government—that the victims were out of work and needed a job, that some had small children and were themselves practically children, and that the combination of these factors created an "economic dependency" were typical of the victims the Mann Act was designed to

protect, and therefore that a § 3A1.1 enhancement was inappropriate. *Id.*[7]

Just as in *Sabatino,* none of the "vulnerable" characteristics of Castaneda's victims discussed by the district court-indebtedness, low income, and lack of financial resources or other options that would permit them to support themselves or pay for their passage back to the Phillippines if they left the club- distinguish them from the typical victims of a Mann Act violator.[8] The only difference between *Sabatino* and the case before us is that here the victims were transported internationally rather

**6.** The dissent argues that the recent amendments to the Mann Act render the legislative history of the original act irrelevant. However, as the First Circuit pointed out in *Sabatino,* despite amendments and judicial interpretations of the Act extending its application to other situations, "the statute's original and primary concern with the protection of the victims remained unchanged." *Sabatino,* 943 F.2d at 103.

**7.** The dissent relies heavily on the argument that Castaneda tricked B.G.S.N. into providing sexual services by misrepresentation: i.e., that she would have a legitimate job in Saipan. However, both parties agree that the district court did *not* rely on misrepresentation in applying the enhancement. There was, in fact, a compelling legal reason not to do so. At sentencing, the district judge stated:

> I do not believe that any victim is vulnerable because of the fact situation in this case that there were misrepresentations. I see that there could be two similarly situated people that one was vulnerable and one that wasn't under the same facts of the violation of the Commonwealth Code, § 1341. And I've said why, because of the vulnerability based on economic situations. So I think they're different things.

As a matter of law, it would have been improper for the district judge to apply the adjustment on the basis of misrepresentation. The adjustment may not be applied "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline." U.S.S.G. § 3A1.1 cmt. (n.2). One element of the offense under § 2421 is that the sexual activity for which the individual is transported is a crime. 18 U.S.C. § 2421. Castaneda pleaded guilty to transporting B.G.S.N. for sexual activity in violation of the Commonwealth Code's offense of sexual exploitation, which includes using "misrepre-

sentation" or "coercion" to cause a person to provide sexual services for pay. 6 N. Mar. I. Code § 1341(c), 1342 (1997). Misrepresentation is thus incorporated in Castaneda's offense, and therefore could not properly be considered in determining whether Castaneda's victims were vulnerable.

**8.** The dissent states that Castaneda was "forced to participate in the prostitution activity." However, there is no evidence in the record suggesting that the employees of the Mood & Music Club were physically forced to engage in sexual activity. In fact, the district court explicitly ruled that "it wasn't coercion and ... there wasn't a gun put to their head. But I think it was pretty coercive economically." The dissent quotes the statement in the plea agreement that the women "were forced to line up for selection by male customers." This appears to be simply an unfortunate choice of words; the PSR states that the women were "instructed" to line up in front of the male customers.

The dissent also states that as a nonresident alien worker under Northern Mariana Islands law, "she could not work elsewhere." In fact, upon the filing of a valid labor complaint, a nonresident worker may be transferred to a new employer. 3 N. Mar. I.Code § 4444(e)(5). If the women had left Castaneda's club to work illegally for a different employer, they would have been sent home. 3 N. Mar. I.Code §§ 4434(g), 4437(e). Either way, they were not, as the dissent suggests, "stranded in a foreign country" with no option to find a different employer. Castaneda's victims were not more vulnerable than women from other countries tricked into coming to the mainland United States to engage in prostitution. Those women typically not only do not have the funds to return home but also run the risk of being taken into custody by the INS and quite possibly prosecuted as well.

than within the United States. However, as the court in *Sabatino* points out, the legislative history of the Mann Act makes it clear that it was precisely such international victims of prostitution whose problems underlay the passage of the Act and who were the very class of victims that the Act's provisions were designed to protect.

As the *Sabatino* court's review of the legislative history reveals, "[t]he Act was enacted amidst reports [of] the importation of illegal aliens for prostitution and other immoral purposes (or white slave traffic, which was in fact its original name)." *Id.* (citing Report Before Congress by the U.S. Commissioner General of Immigration on the Repression of the Trade in White Women, S.Doc. No. 196, 61st Cong., 2d Sess. (1909), H.R.Rep. No. 47, 61st Cong., 2d Sess. (1909)). In addition to the legislative history of the Mann Act discussed by the First Circuit in *Sabatino*, a survey of the recent literature on human trafficking indicates that poverty, lack of financial resources, and inability to otherwise find a job or to return to one's country are typical characteristics of victims of forced prostitution rings. Reports of unemployed women, particularly in recent years from the former Soviet Union, accepting offers of employment in the United States as "models," "dancers," and "waitresses" only to find that they have been sold into prostitution are legion, as are stories of domestic runaways with no source of income or support being lured into sexual slavery. *See, e.g.,* Christopher M. Pilkerton, "Traffic Jam: Recommendations for Civil and Criminal Penalties to Curb the Recent Trafficking of Women from Post–Cold War Russia," 6 *Mich. J. Gender & L.* 221, 227–230 (1999); Becki Young, "Trafficking of Humans Across United States Borders: How United States Laws Can be Used to Punish Traffickers and Protect Victims," 13 *Geo. Immigr. L.J.* 73, 73–80 (1998); Susan Feanne Toepfer & Bryan Stuart Wells, "The Worldwide Market for Sex: A Review of International and Regional Legal Prohibitions Regarding Trafficking in Women," 2 *Mich. J. Gender & L.* 83, 89–90 (1994).

Although the factors leading to the economic vulnerability of Castaneda's victims are not always associated with victims of a Mann Act violation, they are typically associated with such an offense. *See United States v. Footman,* 66 F.Supp.2d 83, 96 (D.Mass.1999) (finding that the vulnerable victim enhancement does not apply because "homelessness" and "economic exigency" are "typically associated" with a Mann Act violation). If harsher penalties should be imposed for Mann Act offenses of the type committed here, that must be done on a basis provided by law, not through the improper use of the vulnerable victim enhancement. Accordingly, we find that the district court erred in applying that provision when sentencing the defendant.

## CONCLUSION

Castaneda's sentence is VACATED and REMANDED for resentencing consistent with this opinion. The mandate shall issue forthwith.

SILVERMAN, Circuit Judge, dissenting:

It is difficult to understand how the majority can equate (1) a woman who is intentionally tricked into leaving her home in a foreign country on the promise of a legitimate job, and then—in the words of the plea agreement—"*forced* to line up for selection by male customers to accompany them to private ... rooms" and there, "*made* to provide sexual services," with (2) a professional prostitute who willingly agrees to travel across state lines for the purpose of prostitution. Both are covered by the Mann Act, but the majority holds that the former is no more a "vulnerable victim" than the latter. This is obviously wrong, and therefore, I respectfully dissent.

The majority derives its conclusion from the premise that "economic hardship" is typical of women victims in Mann Act cases. Even assuming that to be true, the majority completely overlooks the fact that

this case involves much more than ordinary economic vulnerability.

The victim in this case was *tricked* into leaving a foreign country on the promise of a legitimate job.

As a direct result of this deception, she was *stranded* in a foreign country and, as found by the district judge, "couldn't just pack up and go home."

Because the victim was an indentured nonresident alien worker under Northern Mariana Islands law, she *could not work* elsewhere.[9]

She was *forced* to participate in the prostitution activity.

In these important respects, this case is unlike any of the cases cited as "typical" by the majority. In *United States v. Sabatino*, 943 F.2d 94 (1st Cir.1991), the women who worked as prostitutes in the defendant's escort business did so knowingly and willingly. They were interviewed, hired, and then trained in "effective prostitution techniques". *Id.* at 97. True, many of the women were unwed teenage mothers in need of a job, but they were not deceived. They knew the job description.

Likewise, it may be true that "runaway status, homelessness and economic exigency" are typical of some women and girls who turn to prostitution, *United States v. Footman*, 66 F.Supp.2d 83, 96 (D.Mass. 1999), but the victim in the present case did not turn to prostitution because of homelessness or economic exigency. She did not turn to prostitution at all. The victim was lured to Saipan on false pretenses, trapped there, then forced to provide sexual services to the defendant's customers. It is important to recognize that it was the *defendant's conduct*, including her misrepresentations, that created the economic plight in which the victim found herself. None of the cases cited by the

majority deals with anything remotely resembling this scenario. This is an entirely different situation.

The legislative history quoted by the majority is interesting but irrelevant. For one thing, the statute was completely rewritten in 1986. The legislative history cited by the majority concerns the original 1910 version. Whatever the intent may have been in 1910 with respect to white slavery, the current statutory language no longer speaks in terms of the transportation of "any woman or girl for the purpose of prostitution or debauchery, or with intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or give herself up to debauchery, or to engage in any other immoral practice." White–Slave Traffic (Mann) Act, ch. 395, 36 Stat. 825 (1910). The statute now broadly prohibits the interstate transportation of any individual (of either sex) with the intent that such individual engage in prostitution or other sexual crime. See 18 U.S.C. § 2421.

The present statutory language covers more than just white slavery cases. It is broad enough to encompass the transportation of professional prostitutes as well as innocent victims. In *United States v. Pelton*, 578 F.2d 701 (8th Cir.1978), the defendant was convicted of several Mann Act violations for sending three professional call girls from St. Louis to Chicago "to 'work' [the] boat show", and for sending another call girl from St. Louis "to work at Penny's Cozy Corner, a house of prostitution in Winnemucca, Nevada." *Id.* at 705.

My colleagues in the majority would see no legal difference between the "victims" in *Pelton* and the unfortunate woman in this case who was inveigled to leave her home and come to a foreign country on the

---

9. Nonresident Workers Act, 3 N. Mar. I. Code §§ 4411–4452 (Jan.1997), (Add.1–33). Under the Act, "the employment of nonresident workers [is] temporary and generally limited to the duration of the specific job or employment for which the alien was recruited." *Id.* at § 4411(a), para. 2, (Add.1). Such a worker

"shall not be permitted to perform any services or labor within the Commonwealth for any employer other than the employer for whom the [Department of Labor and Immigration] has approved an employment contract with such worker, ..." *Id.* at § 4437(e), (Add.21–22).

false promise of a legitimate job. Because I do, I respectfully dissent.