**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Maria MEDRANO, Defendant–**
**Appellant.**

**No. 00–30067.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 6, 2000

Filed Feb. 26, 2001

Amy Rubin, Federal Public Defender, Spokane, Washington, and Christina A. Gerrish, Federal Defenders of Eastern Washington and Idaho, Spokane, Washington, for the defendant-appellant.

Thomas O. Rice, Assistant United States Attorney, Spokane, Washington, for the plaintiff-appellee.

Before: B. FLETCHER and FISHER, Circuit Judges, and SCHWARZER, District Judge.*

FISHER, Circuit Judge:

Maria Medrano appeals her sentence imposed after pleading guilty to 15 counts of embezzlement. Medrano contends the district court erred in imposing a vulnerable victim enhancement and a position of trust enhancement on her sentence. Medrano argues that the record does not support a finding of vulnerability based on the combination of characteristics found by the district court and that the district court applied the vulnerable victim enhancement solely because of the ethnicity of her victims. She also asserts that as a bank teller she did not possess managerial or other unique responsibilities and thus was not in a "position of trust." We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

---

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

## I. Background

Medrano began working as a teller at Seafirst Bank in Quincy, Washington in 1993. She was one of the few tellers who spoke Spanish fluently, and thus often assisted the bank's many Hispanic customers. Initially, Medrano worked as a "casual," nonbenefitted, part-time teller; however, she eventually advanced to be third in the chain of authority at the eight-employee branch. In her position as Teller Leader/Customer Service Representative, she had powers and responsibilities beyond those of a normal teller. Medrano had the authority to open new accounts without supervisory approval; she could sign cashier's checks for more than $10,000 without approval; she had authority to open the branch; and she functioned as the manager of the bank in the absence of the manager and assistant manager.

Medrano began to embezzle money from Seafirst in 1996, when she separated from her husband and was having trouble supporting her children on her single income. To facilitate her embezzlement scheme, Medrano opened a fictitious account at the bank under the name of "Gutierrez." When certain customers came in to deposit or transfer money into a certificate of deposit account, Medrano would put their money in her teller drawer, provide them with a handwritten receipt and then deposit the funds into the Gutierrez account. If a customer later requested a withdrawal on the basis of one of her handwritten receipts, Medrano would pay the customer with funds she surreptitiously withdrew from the Gutierrez account, thereby concealing from the customer the fact that she had not properly deposited the customer's funds. By juggling the embezzled funds in this manner, Medrano was able to withdraw large sums of money from the Gutierrez account for her personal use, while avoiding detection by Seafirst.

Medrano's activities came to light in October 1998, when a customer went to another teller to redeem a certificate of deposit based on a handwritten receipt issued by Medrano. Because Medrano had not deposited the money in the customer's name, but instead had deposited the money in the Gutierrez account, the bank had no record of the customer's $8,000 deposit. The resulting investigation revealed Medrano had embezzled $219,615.78 from customers' accounts.

After Medrano pled guilty to 15 counts of embezzlement under 18 U.S.C. § 656, the district court conducted a sentencing hearing at which Seafirst Manager Suzanne Rose and Assistant Manager Dawn Jessup testified. Both women explained the extent of Medrano's responsibilities and duties at the bank. Further, they said they believed Medrano had targeted certain customers, specifically Spanish-speaking migrant farm workers who had come to the United States from one of the poorest areas in Mexico, who were unsophisticated in American banking practices and many of whom were illiterate. In support of this observation, Rose testified that although the bank has hundreds of customers with whom Medrano worked, the 20 victimized customers shared several characteristics. According to Rose:

> None of them spoke English, none of them were very sophisticated at all in the ways of banking. They worked hard and they brought their money to the bank, set up savings accounts, set up CD's, many of them did, to send money back to their families in Mexico, but none of these customers that were embezzled from had any sort of education, had any experience at all in the banking area and relied upon us to give them that expertise.

She also testified that at least half of Medrano's victims were illiterate in both English and Spanish. Jessup testified that the victimized customers were ones who did not understand they were supposed to receive monthly statements. The district court did not hear testimony from the victimized customers themselves. Based on the bank employees' testimony, the district court adjusted Medrano's offense lev-

el upward two levels for abusing a position of trust and two levels for victimization of a vulnerable class. The court sentenced Medrano to a 24–month term of incarceration, a five-year term of supervised release and ordered payment of $185,988.36 in restitution and $1,500 in special penalty assessments.

## II. Analysis

### A. Vulnerable Victim Enhancement

Medrano contends the evidence presented at her sentencing hearing does not warrant the district court's application of the "vulnerable victim" enhancement. We review a district court's construction, interpretation and application of the Sentencing Guidelines de novo. *United States v. Randall*, 162 F.3d 557, 560 (9th Cir. 1998). We review a district court's factual findings regarding the vulnerability of victims for clear error. *United States v. Archdale*, 229 F.3d 861, 869 (9th Cir.2000).

Congress has evinced an ongoing concern for the creation and protection of the rights of crime victims by enacting legislation aimed at bolstering victims' rights and roles in the criminal justice process.[1] The Sentencing Guidelines' recognition of victims' circumstances and characteristics during the sentencing process is consistent with such congressional concerns. The vulnerable victim enhancement recognizes that certain individual victims or types of victims are less able to protect themselves

from criminal machinations. Because criminals are more likely to succeed in achieving their criminal purposes and less likely to be apprehended when committing crimes against particularly vulnerable victims, "a higher than average punishment is necessary to deter the crimes against them." *United States v. Grimes*, 173 F.3d 634, 637 (7th Cir.1999). Crimes against vulnerable victims also warrant additional punishment because the criminal's choice of such victims evidences an "extra measure of criminal depravity." *United States v. Castellanos*, 81 F.3d 108, 111 (9th Cir. 1996). Further, the vulnerable victim enhancement serves the special needs of vulnerable victims by creating a greater level of societal protection for those who are most in need of such protection. *See United States v. Randall*, 162 F.3d 557, 560 (9th Cir.1998).

Section 3A1.1(b)(1) of the Sentencing Guidelines provides that: "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase [the offense level] by 2 additional levels."[2] We have explained the application of this section of the Sentencing Guidelines as follows: "Section 3A1.1 . . . 'will apply to increase the offense level where (1) a victim was either (a) unusually vulnerable due to age, physical, or mental condition, or (b) otherwise particularly susceptible to the criminal conduct, and (2) the defendant knew or should have known

---

1. The first federal victims' rights legislation was the *Victim and Witness Protection Act of 1982* (VWPA). Congress amended and expanded the VWPA with the passage of the *Victims of Crime Act of 1984*, the *Victims Rights and Restitution Act of 1990*, the *Violent Crime Control and Law Enforcement Act of 1994*, the *Antiterrorism and Effective Death Penalty Act of 1996* and the *Victim Rights Clarification Act of 1997*. *See generally*, U.S. Department of Justice, Office of the Attorney General, Attorney General Guidelines for Victim and Witness Assistance (2000).

2. The Commentary states that a " 'vulnerable victim' means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under

§ 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct. Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." U.S.S.G. § 3A1.1, comment. (n.2).

of such vulnerability or susceptibility.' " *United States v. Scrivener*, 189 F.3d 944, 950 (9th Cir.1999) (quoting *U.S. v. Castellanos*, 81 F.3d at 110). The vulnerable victim enhancement, therefore, may be predicated on a trait or condition that makes a victim "particularly susceptible to criminal conduct." This Court has held that a wide range of victim characteristics can satisfy this requirement. *See United States v. Wetchie*, 207 F.3d 632, 636 (9th Cir.2000) (holding a sleeping victim of sexual abuse was particularly susceptible to criminal conduct); *United States v. Weischedel*, 201 F.3d 1250, 1255 (9th Cir.2000) (holding a car salesman who was obligated to go on a drive with assailants was particularly susceptible to criminal conduct); *United States v. Randall*, 162 F.3d 557, 560 (9th Cir.1998) (holding persons known to have fallen for telemarketing scams previously were particularly susceptible to criminal conduct); *United States v. Peters*, 962 F.2d 1410, 1418 (9th Cir.1992) (holding victims with poor credit histories were particularly susceptible to schemes involving offers of preapproved credit cards).[3]

■ A vulnerable victim enhancement cannot, however, be based on the victim's ethnicity alone. *See Castellanos*, 81 F.3d at 112. In *Castellanos*, the defendant ran an investment scheme that promised investors a high rate of return, but which in reality worked to defraud investors. The investment company billed itself as a "proudly Hispanic company" and advertised primarily in Spanish-language media. The district court applied a vulnerable victim enhancement to the defendant's sentence after finding that the victims were particularly susceptible to the scheme by virtue of their being Spanish-speakers or Hispanic individuals. In setting aside the enhancement, this Court concluded that "[n]othing in the record supports a finding that the Spanish-speaking population of Southern California as a whole shares some unique susceptibility to fraud that warrants the law's protection, or that makes [the defendant's] crime especially reprehensible." *Id.* We noted, however, that the ethnicity of a victim or class of victims might, in conjunction with other evidence of vulnerability, support a vulnerable victim enhancement.

> This is not to say that [the vulnerable victim enhancement] would never apply against a defendant accused of running an "affinity scam" by which a minority business owner victimizes people in his own community who are more likely to trust members of their own ethnic group. Evidence that an ethnic group was particularly susceptible to the fraud due to lack of education, extreme insularity, superstition, or lack of familiarity with United States business practices or law enforcement might suffice to support a use of [the vulnerable victim enhancement] against a defendant accused of swindling members of such a group.

*Id.*

■ Medrano argues the application of the vulnerable victim enhancement to her sentence was improper under *Castellanos* because the district court found that the bank customers from whom she embezzled were vulnerable victims on the basis of their ethnicity.[4] Medrano's argument is

---

**3.** *Compare United States v. Castaneda*, 239 F.3d 978, 982 (9th Cir.2001) (holding the enhancement inappropriate for a Mann Act violation because the victims were "typical of the victims the Mann Act was designed to protect....") That is not the circumstance here where the bank embezzlement statute encompasses a broad array of potential victims.

**4.** Although Seafirst, rather than the account holders, was the technical victim of the offense of conviction, the account holders suffered significant inconvenience and emotional distress, and thus were properly considered "victims" for the purpose of applying the vulnerable victim enhancement. *See United States v. Haggard*, 41 F.3d 1320, 1326 (9th Cir.1994) (holding the harmed victim need not be the victim of the offense of conviction); *accord United States v. McCall*, 174 F.3d 47, 51 (2nd Cir.1998) (holding bank customers affected by embezzlement could be "victims" for purposes of vulnerable victim enhancement).

without merit. The district judge specifically disavowed a finding of vulnerability based solely on the victims' shared language, stating, "the fact that the account-holders are Spanish-speaking does not make them a vulnerable class." The district court then articulated the basis for the enhancement—specifically, a combination of characteristics encompassing much more than the commonality of language or ethnicity: ·

> Virtually all [of the victims] are migrant workers from the same impoverished area of Mexico. Virtually all are unable to read or write in their native language, and virtually all are extremely unsophisticated in matters pertaining to banking and commerce. While no one of those factors would be enough to create a class of vulnerable victims, the combination of factors is sufficient to create such a class.

Given such findings, it is clear the district court did not rely on ethnicity alone to support its application of the vulnerable victim enhancement, but rather relied on a combination of characteristics related to but extending beyond ethnicity that collectively rendered Medrano's victims particularly susceptible to her embezzlement scheme.

■ Medrano argues, however, that despite the district court's articulated reliance on a combination of victim characteristics, the identified characteristics, other than language and ethnicity, lack support in the record. Again, Medrano's argument is without merit.

■ The district court's factual findings at sentencing must be supported by a preponderance of the evidence. *United States v. Valensia,* 222 F.3d 1173, 1178 (9th Cir.2000). Here, the district court relied upon testimony of the two bank managers, Suzanne Rose and Dawn Jessup, to arrive at its factual findings regarding the vulnerable victim enhancement. Both Rose and Jessup had extensive personal contacts with Medrano's victims after the discovery of the embezzlement.

The two managers worked with the victims to reconstruct their account activity in an attempt to understand fully the extent of Medrano's criminal activity and to compensate the victims for their losses. Rose testified, based on her personal interactions with the victims, that she believed Medrano's scheme targeted customers who exhibited the specific characteristics later found by the district court to justify the enhancement. Jessup testified to the same effect.

■ On cross-examination, both Rose and Jessup admitted they could not state with certainty that all of Medrano's victims were illiterate. Jessup also admitted she could not state with certainty that all of Medrano's victims lacked knowledge of banking practices. Nonetheless, the district court determined that the vulnerable victim enhancement was warranted because "virtually all" of Medrano's victims were Spanish-speaking, illiterate and unsophisticated in banking practices. Application of the vulnerable victim enhancement does not require that the district court find *all* of the victims were particularly susceptible to Medrano's scheme. Rather, "the judge must determine whether one or more of the victims" belong to a class that is particularly susceptible to the criminal activity in question. *United States v. Luca,* 183 F.3d 1018, 1025 (9th Cir.1999); *See U.S. v. Scrivener,* 189 F.3d at 952 (holding "[a] single vulnerable victim is sufficient to support application of the [vulnerable victim] enhancement"). Although the precise number of Medrano's victims who were illiterate, Spanish-speaking and unsophisticated with regard to banking practices may be in dispute, Rose and Jessup testified that a high percentage of Medrano's victims exhibited such characteristics, and the district court accepted that testimony.

In sum, the district court's findings regarding vulnerability are supported by the record. The court did not err in applying

the vulnerable victim enhancement to Medrano's sentence.

### B. Position of Trust Enhancement

■■■■■ Medrano also challenges the district court's decision to enhance her sentence two offense levels for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3. The application of the abuse of trust enhancement is a mixed question of fact and law that we review de novo. *United States v. Isaacson*, 155 F.3d 1083, 1084 (9th Cir.1998).

■■■■ The Sentencing Guidelines mandate a two-level increase "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense...." U.S.S.G. § 3B1.3. The critical inquiry with regard to the application of this enhancement is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Isaacson*, 155 F.3d at 1086 (quotations omitted).

Medrano argues she lacked managerial capacity or unique duties at Seafirst and thus her position as a mere bank teller should not qualify as a "position of trust." The evidence presented at her sentencing hearing, however, indicates the opposite. Both Rose and Jessup testified at length regarding the extent of Medrano's duties and responsibilities, establishing that she had the freedom to engage in numerous types of transactions without the managerial approval that other, lower-level tellers were required to obtain. After hearing this testimony, the district court found:

> ... the defendant was more than a mere bank teller. Hers was the third most responsible position in the branch where she worked. Not only could she open new accounts, but she could issue cashier's checks up to $100,000, and she could arrange wire transfers of up to $1,000,000. The defendant's ability to open new accounts was essential to her scheme. Because of it, she was able to create a slush fund, fabricate receipts, provide cash on demand, and effectively bypass the bank's computer system.

Thus, Medrano's scheme, and her ability to engage in it without detection, were facilitated by her ability to engage in the necessary transactions without supervisory approval. Her position provided her with the freedom to commit her difficult-to-detect embezzlement activities. Accordingly, the district court properly increased Medrano's sentence two offense levels pursuant to § 3B1.3 of the Sentencing Guidelines.

AFFIRMED.