UNITED STATES of America,
Plaintiff–Appellee,

v.

Daniel MENDOZA, aka Daniela
Mendoza, Defendant–
Appellant.

No. 00–10276.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 15, 2000

Filed Aug. 27, 2001

Daniel P. Blank, Assistant Federal Public Defender, San Francisco, California, for the appellant.

Haywood S. Gilliam, Jr., Assistant United States Attorney, San Francisco, California, for the appellee.

Before: KLEINFELD, HAWKINS, and TALLMAN, Circuit Judges.

1. 18 U.S.C. § 371 (1994 & Supp. V 1999).

2. 18 U.S.C. § 1426(b) (1994 & Supp. V 1999).

3. 18 U.S.C. § 912 (1994 & Supp. V 1999).

KLEINFELD, Circuit Judge:

Daniel Mendoza was convicted of conspiracy,[1] sale of false immigration documents,[2] and impersonating a United States official.[3] He appeals the two-level vulnerable victim enhancement made to his sentence pursuant to U.S.S.G. § 3A1.1(b).

## Facts

Mendoza won asylum in this country on the ground that he faced persecution in Nicaragua on account of being a pre-operative transsexual.[4] His asylum was rescinded following felony convictions for burglary and grand theft in 1993. He was scheduled to be deported in 1994 but was allowed to remain in the United States when he agreed to act as an informant for the Immigration and Naturalization Services. He also worked as an informant for the Drug Enforcement Agency and the San Francisco police.

In this case, Mendoza, presenting himself as Daniela Mendoza, posed as an employee of the INS and sold false employment documents to illegal aliens. In April 1998, INS raided a workplace, and several illegal aliens who worked there fled into the street and into an adjacent freeway, fearful of being arrested and deported. They avoided apprehension but were fired. Two of the illegal aliens and later a third, approached Mendoza's coconspirator, Sandra Vasquez, after a supervisor had told them that Vasquez could help arrange papers for them. Vasquez and Mendoza told the aliens that they would help them get "working papers" in exchange for $1,000 each. Mendoza said he worked for the INS as "bait" and knew how to do this.

4. The parties are not consistent in which gender they choose for pronouns, and Mendoza's sex does not matter to the case. Mendoza has had hormone treatments but not the required surgery to change sex, so we use the male gender.

Mendoza and Vasquez took two of the aliens across the street from the federal building where the INS had its office to get their pictures taken at a photography shop. Then they assisted the aliens with preparing fingerprints, money orders, and filling out applications for the aliens' signatures. The papers were applications for asylum, not for any kind of "working papers," but the aliens could not read English and did not know this. Mendoza and Vasquez brought the aliens into the building to exchange the applications and money for "working papers." They paid Vasquez in the women's bathroom in the federal building. The third alien filled out the application and paid Mendoza for the false papers in the alien's home.

The district court imposed a two level upward adjustment on the ground that the victims were especially vulnerable.[5] The judge stated that because he had tried the case, he was relying on his personal observations of the witnesses, as well as the presentence report. Mendoza had been convicted of many thefts, which increased the practical impact of his two level enhancement in this case.

Defense counsel argued that the adjustment could not be imposed under *United States v. Castellanos*,[6] reading that case as barring adjustments based on treating all persons of a particular targeted ethnicity as vulnerable. The district judge distinguished *Castellanos:* "This is a different case, in my view, because the vulnerability is not that they are Hispanic; the vulnerability is that they are illegal. They are people who are here under a cloud and therefore they are—they know they must do something.... They are afraid. They are particularly vulnerable because they

are here illegally." The judge recalled "one victim who testified who seemed particularly vulnerable, not very sophisticated at all, very frightened by what was going to happen to her and her family if she had to leave."

## Analysis

The guideline at issue, U.S.S.G. § 3A1.1(b), provides:

(1) If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels.

(2) If ... the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by 2 additional levels.[7]

An application note defines "vulnerable victim" as a person unusually vulnerable to the offense because of "age, or physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."[8] It explains that the subsection at issue

applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.[9]

5. U.S.S.G. § 3A1.1(b)(1).

6. 81 F.3d 108 (9th Cir.1996).

7. U.S.S.G. § 3A1.1(b)(1).

8. U.S.S.G. § 3A1.1, n. 2.

9. *Id.*

■ Appellant argues that the district court abused its discretion because the vulnerable victim enhancement cannot be based on characteristics shared by a class of persons.

The contention is plainly mistaken. The application note itself defines groups of vulnerable victims by class characteristics, such as people who are unusually vulnerable because of age or physical or mental condition.[10] The example of a proper application in the note, marketing an ineffective cancer cure,[11] treats the class of people with cancer as vulnerable.

■ Appellant argues that we have ruled out class-based vulnerability in *United States v. Castellanos*.[12] That misreads the case. In *Castellanos*, we held that the adjustment could not be applied to Hispanics as vulnerable victims, because the pyramid scheme at issue addressed "ethnic pride" and "cultural affinity."[13] We specifically noted that the adjustment "may be supported by the more generalized finding that the members of a targeted group share a particular susceptibility,"[14] which is to say, that the vulnerability may apply to a class of victims. The holding was that Hispanics were not "vulnerable victims" for the particular crime in the particular circumstances.[15] The guideline adjustment, we held, is directed toward those "in need of greater societal protection," so that when they are victimized, their special vulnerability "render[s] the defendant's conduct more criminally depraved."[16]

The case at bar is like *United States v. Matsumaru*,[17] not *Castellanos*. In *Matsumaru*, we rejected the argument that the adjustment was improperly based on the visa fraud victims' being Japanese nationals.[18] That alone would not have made them especially vulnerable, but in the circumstances of the case, they were vulnerable because (1) they needed the visas, (2) they were unfamiliar with American law and practices, (3) the lawyer was bilingual and represented himself as knowing what to do, and (4) their culture placed "absolute trust in lawyers."[19]

We similarly distinguished *Castellanos* in *United States v. Medrano*.[20] We affirmed an enhancement to an embezzling teller who victimized illiterate Mexican migrant workers.[21] What made them vulnerable was not that they were Mexican, but that they were unsophisticated in American banking practices, and that they were illiterate, so they had to rely on what the teller said about the papers.[22]

Likewise, in this case what made the victims vulnerable was not that they were Hispanic. They were vulnerable because (1) they were in the United States illegally, which made Mendoza confident they would not check on him or report him, (2) they were unfamiliar with United States immigration law, (3) they were not well educated, (4) they could not speak or read English, and (5) Mendoza held himself out as

10.  *Id.*

11.  *Id.*

12.  81 F.3d 108 (9th Cir.1996).   .

13.  *Id.* at 110.

14.  *Id.*

15.  *Id.* at 112.

16.  *Id.* at 111.

17.  244 F.3d 1092 (9th Cir.2001).

18.  *Id.* at 1107–08.

19.  *Id.*

20.  241 F.3d 740 (9th Cir.2001).

21.  *Id.* at 745.

22.  *See id.*

sophisticated and knowledgeable in INS procedures.

■ Mendoza's strongest argument is that what made these victims vulnerable, basically their illegal immigrant status, would apply to substantially all buyers of fraudulent papers, and is already taken into account in the guideline. We held in *United States v. Wetchie* that the adjustment was appropriately applied to sexual abuse of a victim who was sleeping, because being asleep made her vulnerable.[23] We pointed out in dictum in *Wetchie* that "the adjustment should not apply when vulnerability is already reflected in the offense guideline," so "although any victim of abusive sexual contact with a minor might be described as vulnerable on account of her minority, her age does not make her any more vulnerable than other victims of this offense" and enhancement on account of being a minor "would therefore be inappropriate."[24]

We converted this dictum into a holding in *United States v. Castaneda*, where we held (over a strong dissent) that the persons transported to provide illegal sexual services were not "vulnerable victims" because all the characteristics that made them vulnerable were "typically associated with such an offense."[25] We qualified our holding in *Castaneda*, though, by noting that the guideline "does not, however, require that the victims be more vulnerable than the typical victims of the particular *scheme* or type of *scheme*."[26]

The case at bar is distinguishable from *Castaneda* because the facts and statutes of conviction are different. Mendoza was convicted of three offenses. The first was conspiracy to commit an offense "against the United States,"[27] a crime in which the government is ordinarily the only victim.

The second offense was sale of immigration documents.[28] Victims of that crime might include the purchasers needing the documents, employers who relied on the papers, government agents thought to be tricked by them, and others. Some buyers of illegal papers may be illegal aliens seeking to avoid deportation, some may be cynical middlemen planning to victimize illegal aliens themselves. The statute of conviction applies even more broadly, to embrace persons who use false papers as well as those who sell them, so that the victims would ordinarily be government agencies and employers tricked by the papers.[29]

---

**23.** 207 F.3d 632, 633, 636 (9th Cir.2000); *see also United States v. Ciccone*, 219 F.3d 1078, 1087 (9th Cir.2000) ("The district court did not clearly err when it determined that the victims were vulnerable because they were repeatedly targeted for further fraudulent solicitations."); *United States v. Weischedel*, 201 F.3d 1250, 1255 (9th Cir.2000) (holding that the district court did not err by imposing the vulnerable victim adjustment when it considered the vulnerable circumstances the victim was in, including the remote location); *United States v. Randall*, 162 F.3d 557, 560 (9th Cir.1998) (explaining that victims of a reloading scheme were particularly susceptible where the defendant sought out people who had a track record of falling for fraudulent schemes); *United States v. James*, 139 F.3d 709, 714–15 (9th Cir.1998) (concluding that a pregnant bank teller who was threatened dur-

ing a robbery was a vulnerable victim); *United States v. Johnson*, 132 F.3d 1279, 1286 (9th Cir.1997) (holding that a minor who had "been in the country for only a few weeks when the adult responsible for his care and well-being initiated a series of sexual advances" was a vulnerable victim).

**24.** *Wetchie*, 207 F.3d at 634 n. 4.

**25.** 239 F.3d 978, 983 (9th Cir.2001).

**26.** *Id.* at 981 n. 4.

**27.** 18 U.S.C. § 371.

**28.** 18 U.S.C. § 1426(b).

**29.** *Id.*

The third offense was pretending to be a federal employee and obtaining money by so pretending.[30] That would apply not only to one who impersonated an INS employee to get money from illegal immigrants, but also one who pretended to be an IRS employee to get money from a taxpayer, or a customs official to get money from an importer.

Because of the breadth of the statutes of conviction, it cannot be said, as it was said in *Castaneda*, that substantially all the victims of the crimes of conviction are, like the victims in this case, vulnerable in the same way for the same reasons. Instead, the case at bar is like the one carved out in *Castaneda* as one where the *scheme* but not the *offense* typically targets people like the victims here, so the adjustment may apply.[31]

Our review of fact findings, such as findings that the victims were vulnerable, is limited to whether the district court clearly erred.[32] The district judge gave sound reasons for his vulnerable victim finding, based on his personal observation of the victims at trial and consideration of their testimony. The judge did not "clearly err" in imposing the enhancing adjustment based on these findings.

Appellant argues that the guideline includes a knowledge requirement. This is correct. The guideline applies to a defendant who "knew or should have known" of the special vulnerability.[33] The knowledge requirement was satisfied, though, because Mendoza dealt with each victim personally.[34] In *United States v. O'Brien*, we explained that because the appellants personally talked to and stalled victims with unpaid medical bills, they knew or should have known that the victims were vulnerable.[35] Mendoza dealt with these people personally and individually, and knew of their language limitations and their desperation.

This case is distinguishable from the example in the application note "in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile."[36] That example is of a crime in which the victims towards whom the perpetrator addresses the criminal conduct are not known by him to be vulnerable, but one of them fortuitously turns out to be. Here, the example has no application. The perpetrator of the crimes dealt directly and personally with the victims, so he had actual knowledge of their vulnerabilities.

AFFIRMED.

---

30. 18 U.S.C. § 912.

31. 239 F.3d 978, 981 (9th Cir.2001).

32. *United States v. Weischedel*, 201 F.3d 1250, 1252 (9th Cir.2000).

33. U.S.S.G. § 3A1.1(b).

34. *Cf. United States v. Peters*, 962 F.2d 1410, 1416 (9th Cir.1992) (holding that the defendants were subject to the enhancement because they knew or should have known that individuals with poor credit histories were particularly susceptible to their scheme).

35. 50 F.3d 751, 756 (9th Cir.1995); *United States v. Archdale*, 229 F.3d 861, 870 (9th Cir.2000) (explaining that defendant should have known that the victim was a vulnerable victim, as he had lived in the same house with the victim and her mother for a number of years); *United States v. Scrivener*, 189 F.3d 944, 951 (9th Cir.1999) (concluding that Scrivener knew or should have known that his victims were elderly from their voices and the "lead sheets" he used).

36. U.S.S.G. § 3A1.1(b), n. 2.