UNITED STATES of America,
Plaintiff–Appellee,

v.

Kendal Ray WILLIAMS, aka Wren,
aka Paris Carpenter, Defendant–
Appellant.

No. 00–30409.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 7, 2002.

Filed June 5, 2002.

Daniel P. Buckley, Berg, Lilly & Tollefsen, P.C., Bozeman, Montana, for the defendant-appellant.

Michael A. Rotker, United States Department of Justice, Washington, DC, for the plaintiff-appellee.

Before: THOMAS, GRABER, and GOULD, Circuit Judges.

PER CURIAM; Concurrence by Judge GRABER.

PER CURIAM:

A jury convicted Defendant Kendal Ray Williams of four counts of persuading, inducing, enticing, or coercing a person to travel in interstate commerce to engage in prostitution, 18 U.S.C. § 2422(a), and four counts of transporting a minor in interstate commerce with the intent that the minor engage in prostitution, 18 U.S.C. § 2423(a) (referred to herein collectively as "the Mann Act counts"). The jury also convicted Defendant of one count of interstate travel in aid of racketeering, 18 U.S.C. § 1952 ("the Travel Act count").

On appeal, Defendant challenges his convictions on the grounds that (1) the government violated his rights under the Double Jeopardy Clause by charging him under two separate provisions of the Mann Act for each interstate trip; (2) venue did not lie in the District of Montana for the Travel Act count because he lacked intent to commit a crime of violence while he was in Montana; (3) the district court abused its discretion in admitting "other acts" evidence; (4) the district court should not have admitted the statement he made to FBI agents because the agents violated his right to counsel by conducting an interview without providing him with a lawyer; and (5) the government violated his rights under the Confrontation Clause by failing to provide him with an agent's rough notes from that interview.

Defendant also challenges his sentence on the grounds that (1) the district court's sentences on counts 2, 5, 8, and 11 exceeded the statutory maximum; (2) the district court did not give proper notice of its intent to impose consecutive sentences; (3)

the district court miscalculated Defendant's criminal history score; and (4) the district court erred by applying enhancements for victim vulnerability and for the use of extreme physical force.

We hold that (1) convicting Defendant under § 2422(a) and § 2423(a) of the Mann Act for each interstate trip did not violate his rights under the Double Jeopardy Clause; (2) venue was proper in Montana for all counts in the indictment; (3) the district court properly admitted "other acts" evidence because that evidence was inextricably intertwined with the crimes charged; (4) the admission of Defendant's statements to the FBI did not violate his right to counsel; and (5) the government's failure to produce the rough notes from the FBI interview did not violate Defendant's rights under the Confrontation Clause.

As for Defendant's sentence, we hold that (1) the district court erred in imposing sentences that exceeded the statutory maximum for counts 2, 5, 8, and 11; (2) the district court erred by failing to give Defendant notice of its intent to impose consecutive sentences and by failing to inform Defendant of a contemplated ground for that departure; (3) any error in calculating Defendant's criminal history score was harmless; and (4) the physical force enhancements and one of the victim vulnerability enhancements were proper, but we reverse and remand for resentencing so that, in addition to addressing its other errors, the district court may determine whether Defendant's other victim was uniquely vulnerable.

## FACTUAL AND PROCEDURAL HISTORY

### A. *The Mann Act and Travel Act Violations*

In 1994, Defendant began dating S.S., a 15–year–old girl, in Billings, Montana. S.S. lived with her mother and five siblings. S.S. was largely responsible for the younger children because her mother was addicted to cocaine. S.S. knew that Defendant was a pimp and that he took his prostitutes on interstate trips to earn money. Defendant eventually convinced S.S. that prostitution was an effective means of providing for herself and her family.

Initially, Defendant trained S.S. in Billings. He set the prices that S.S. charged and required her to work six days a week. He instructed S.S. to turn over the proceeds of her prostitution to him, and he in turn provided her with food, clothes, shelter, and transportation.

In late December of 1994, Defendant took S.S. and several other prostitutes to Phoenix, Arizona. Defendant's "household" worked in Phoenix for about a month. During this time, S.S. was introduced to Defendant's violent side. S.S. got into a car with a Mexican man and stole his pistol. To punish her for "dating" a Mexican, Defendant beat S.S. with the stolen pistol and shoved the gun into her mouth.

In early 1995, Defendant took his household from Phoenix to California. After working there for about a month, S.S. and Defendant returned to Billings. Defendant's violent control over S.S. continued. Defendant assaulted S.S. and forced her to perform oral sex after he saw her speaking to another man on the street.

In March of 1995, Defendant took S.S. and his other prostitutes from Billings to Washington, D.C. There, Defendant continued to abuse S.S. On one occasion, Defendant stomped on S.S.'s face hard enough to leave an imprint of his boot's sole. Over the next few months, Defendant worked his household in cities along the east coast and eventually took the operation to San Francisco, California. While in San Francisco in August of 1995, S.S. decided to leave Defendant. She in-

formed him of her plans and then, at his request, agreed to meet with him because he had promised to return her belongings. Instead, Defendant trapped S.S. in a zippered bag and took her back to a hotel. Over the next two days, Defendant assaulted S.S. for trying to leave his employ. Defendant beat her with a dog leash, forced her to engage in rough sex with him and another prostitute, and broke her nose. Finally, S.S. escaped and returned to Billings.

In October of 1996, Defendant picked up a hitchhiker, 15–year–old R.K., in Billings. At the time, R.K. was a drug addicted runaway. Defendant convinced R.K. to work for him as a prostitute. He took her to Albuquerque, New Mexico, where she turned tricks at a truck stop. Defendant used violence to control R.K. and took all the proceeds from her prostitution, just as he had done with S.S.

## B. The Indictment and the Arrest

In October of 1999, Defendant, along with nine other men, was charged in a multiple-count indictment. The indictment alleged a large-scale interstate prostitution conspiracy centered in Billings, Montana. Pursuant to that indictment, a warrant was issued for Defendant's arrest.

In November of 1999, FBI agents and the Houston police arrested Defendant at his apartment in Houston, Texas. Defendant was taken to the FBI's offices in Houston, where three agents, including Agent Jeff Tarpinian, interviewed him. Tarpinian advised Defendant that he was under indictment in Montana for transporting minors across state lines for the purpose of prostitution. The agents advised Defendant of his *Miranda* rights.

Defendant signed a form stating that he understood and waived those rights.

Agents then interviewed Defendant for a period that lasted between 45 minutes and an hour. Defendant told the agents that he had pimped underage women in Billings, Montana. He also told agents that he had traveled to Arizona in 1994 with several prostitutes. He denied beating any of the prostitutes who worked for him. Agent Tarpinian took rough notes of the interview with Defendant, which he later condensed into an official report, known as a "302."

## C. The Trial

Defendant was returned to Montana. He moved to sever his trial from that of the other nine men, and the district court granted his motion.[1]

Before his trial was severed, Defendant requested notice of the government's intent to introduce evidence of other acts, pursuant to Federal Rule of Evidence 404(b). The government responded that some evidence of similar acts would be introduced. However, the government asserted that the evidence would be introduced not as Rule 404(b) evidence, but as acts "inextricably intertwined" with the charged conduct.

The government called S.S. and R.K. to testify. S.S. testified for two days about the three interstate trips that she took with Defendant. Those trips supported six of the Mann Act violations, charged in the indictment as counts 2, 3, 5, 6, 8, and 9. The trip that began in Montana and eventually culminated in the two-day beating of S.S. supported count 10, the Travel Act count. R.K. described her trip to New Mexico with Defendant. That trip sup-

---

1. Twelve counts were severed from the original indictment: counts 2 through 12 and 37. Count 1 was a conspiracy charge that the government did not pursue against Defen-

dant. Before trial, the court granted Defendant's motion to dismiss count 37. Thus, Defendant went to trial on eleven charges, counts 2 through 12.

ported two other Mann Act counts—counts 11 and 12.

The government also called FBI Agent Tarpinian to testify about the statements that Defendant had made when he was arrested.

Outside the presence of the jury, the district court held a hearing on Defendant's motion to suppress Tarpinian's testimony about Defendant's statements. Defendant claimed that agents threatened to "smash [his] ass" and "throw [him] through [a] chair." Defendant testified that he said at one point, "I ain't got no lawyer, man. Let me out of here. Let me out of here." Tarpinian testified that Defendant did not request a lawyer, but did eventually say that he was "done talking." At that point, according to Tarpinian, the agents terminated the interview. The district court denied the motion to suppress, finding that the "more credible testimony" was that the interview had terminated when Defendant indicated an interest in a lawyer. The court also determined that Defendant had made the statements voluntarily.

After Tarpinian testified on direct examination, Defendant objected because the rough notes that Tarpinian had taken during the initial interview had not been produced. Defense counsel reserved cross-examination until the notes were produced. During the investigation, Tarpinian had sent the notes to the FBI office in Billings. However, at the time of trial, that office was unable to locate the notes. Tarpinian went back to Houston to try to locate the notes, but to no avail. The defense did not produce any evidence to show that Tarpinian destroyed his notes or that the 302 report was inconsistent with the notes.

At the close of the government's case, the district court granted Defendant's motion for a judgment of acquittal as to two of the Mann Act counts. Those counts, numbered 4 and 7, involved S.W., an alleged victim who did not testify for the prosecution.

The jury ultimately convicted Defendant of the remaining nine counts in the indictment—the six Mann Act counts and one Travel Act count concerning S.S. and the two Mann Act counts concerning R.K. The district court sentenced Defendant to consecutive terms totaling 240 months. This timely appeal followed.

## DISCUSSION

### A. Challenges to the Conviction

Defendant makes five arguments that his conviction was invalid: (1) the two Mann Act convictions for each interstate trip constituted double jeopardy; (2) venue was improper on the Travel Act count; (3) the district court erred in admitting "other acts" evidence; (4) the district court erred in admitting testimony concerning Defendant's statements to the FBI; and (5) the government violated Defendant's rights under the Confrontation Clause when it failed to produce Tarpinian's notes. We will discuss each of those arguments in turn.

#### 1. Double Jeopardy

Defendant first argues that the government violated the Double Jeopardy Clause by charging him under two separate provisions of the Mann Act for each trip across state lines with a minor prostitute. Whether a conviction violates the Double Jeopardy Clause is a question of law that we review de novo. *United States v. Byrne,* 203 F.3d 671, 673 (9th Cir.2000), *cert. denied,* 531 U.S. 1114, 121 S.Ct. 861, 148 L.Ed.2d 774 (2001). In order to determine whether prosecution under the two statutes constitutes double jeopardy, we analyze the text of 18 U.S.C. § 2422(a) and 18 U.S.C. § 2423(a) to determine "whether each provision requires

proof of a[n additional] fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *see also United States v. Garlick,* 240 F.3d 789, 794 (9th Cir.2001) (stating *Blockburger* standard).

The Supreme Court has recognized that comparing statutes to determine whether one set of elements is a subset of another requires a purely textual comparison. *Carter v. United States,* 530 U.S. 255, 260–61, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). This observation is consistent with what we have held in the double jeopardy context: that the *statutory elements,* not the offenses charged in the indictment, are to be compared. *United States v. Nash,* 115 F.3d 1431, 1437 (9th Cir.1997). *Carter* cautions against reading "implicit" meanings into the text when comparing the elements of two statutes for the purpose of determining whether one is a lesser included offense of the other. *Carter,* 530 U.S. at 270–71, 120 S.Ct. 2159. Analogizing from *Carter,* we confine our review here to what the statutes actually say, rather than what they may "implicitly" provide. *Id.* at 271 n. 10, 120 S.Ct. 2159.

Section 2422(a) makes it a crime to "knowingly persuade[ ], induce[ ], entice[ ], or coerce[ ] any individual to travel in interstate . . . commerce . . . to engage in prostitution." Section 2423(a), on the other hand, targets a person who "knowingly transports an individual who has not attained the age of 18 years in interstate . . . commerce . . . with intent that the individual engage in prostitution."

The element contained in § 2423(a) that § 2422(a) does not require is immediately apparent. The person transported in § 2423(a) must be a *minor* for liability to attach, whereas § 2422(a) makes it a crime to coerce any *person* to travel in interstate commerce to engage in prostitution. Thus, under § 2423(a), the government must prove the additional fact of the victim's age.

Conversely, § 2422(a) requires proof of different conduct than that covered by § 2423(a). The conduct that § 2422(a) proscribes is *persuading, inducing, enticing, or coercing* a person to travel. By contrast, § 2423(a) proscribes *actually transporting* the individual. Thus, the *actus reus* is different. Transporting a minor with the intent that the minor engage in prostitution is not the same as persuading, enticing, inducing, or coercing someone to travel in interstate commerce to engage in prostitution. The transportation is the main conduct proscribed in § 2423(a), whereas the persuasion, inducement, enticement, or coercion is the gravamen of § 2422(a). Therefore, the government must prove the additional fact of coercion, persuasion, inducement, or enticement under § 2422(a).

Stated differently, convincing someone to transport himself or herself across state lines for the purpose of prostitution completes the crime under § 2422(a). That persuasion is distinct from the actual transportation. In the same way, § 2422(a) is not necessarily a lesser included offense of § 2423(a). A person could commit the offense under § 2423(a)—actually transporting a minor *with the intent* that the minor prostitute herself—without committing the offense under § 2422(a), i.e., without inducing, coercing, persuading, or enticing that minor to travel to engage in prostitution. This could occur if the trip was, in fact, the minor's idea.

Defendant essentially contends that the conduct proscribed by § 2422(a) is *implicit* in § 2423(a). If someone has violated § 2423(a) by transporting a minor, he reasons, that person must also have persuaded, induced, enticed, or coerced the minor to travel. Although this predicate may be part of the offense under § 2423(a) as an

evidentiary matter in a given case, it is not necessarily part of the offense. In other words, the statute does not require proof of that fact. Under *Blockburger*, the test is what the text of the statute actually requires. *See Nash*, 115 F.3d at 1437 (stating that the appropriate inquiry is to compare the elements of the statute, rather than the way the offenses are charged in a particular indictment).

Defendant urges that *United States v. Johnson*, 132 F.3d 1279 (9th Cir.1997), requires us to hold in his favor. In *Johnson*, we held that it was not error to instruct the jury that § 2423 encompassed criminal liability for *causing* a minor to be transported by an innocent third party. *Id.* at 1285. Defendant argues that this reading of § 2423(a) supports his theory that persuasion, inducement, enticement, or coercion are necessarily implied elements of § 2423(a).

*Johnson* pertains to a different point: the chosen method of transporting the minor. The transportation that is the gravamen of the offense can be accomplished in many ways. All that *Johnson* held is that the transportation can be accomplished indirectly by causing someone else to carry out the transportation, as well as directly. *Cf. Caballero v. Hudspeth*, 114 F.2d 545, 547 (10th Cir.1940) (holding, under an earlier version of the Mann Act, that the gravamen of the offense is transportation, so that having more than one bad motive for transporting a victim states but a single offense).

■ Defendant also points to *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955). There, the Supreme Court held that the same interstate trip could not support two convictions under the *same provision* of the Mann Act simply because two women were transported, because the transportation is the violation, regardless of the number of victims. *Id.* at 82–83, 75 S.Ct. 620. By contrast, here, the

same trip, the same conduct, violated *two different statutes* containing different elements. The same conduct can support convictions for two separate offenses. *United States v. Dixon*, 509 U.S. 688, 704–05, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993); *see also United States v. Anderson*, 851 F.2d 384, 391 (D.C.Cir.1988) (finding no double jeopardy concerns where consecutive sentences were imposed for violations of two separate Mann Act provisions, §§ 2421 and 2423, even though the violations arose out of the same transaction).

■ *In summary, because each statute requires proof of a fact that the other does not, Defendant's convictions do not violate the Double Jeopardy Clause. For the same reason, the superseding indictment is not duplicitous. See Garlick*, 240 F.3d at 794 (applying *Blockburger* test for multiplicity analysis).

### 2. *Venue Under the Travel Act Count*

■ Defendant next argues that venue was improper for count 10, which alleged a violation of the Travel Act, 18 U.S.C. § 1952. We review de novo a claim of improper venue in a criminal case. *United States v. Liang*, 224 F.3d 1057, 1059 (9th Cir.2000).

The general venue statute, 18 U.S.C. § 3237(a), and our precedents foreclose Defendant's argument. The statute provides that an offense may be prosecuted in any district in which such an offense was "begun, continued, or completed." 18 U.S.C. § 3237(a). It further provides:

Any offense involving the use of the mails, *transportation in interstate or foreign commerce*, or the importation of an object or person into the United States *is a continuing offense* and, except as otherwise expressly provided by enactment of Congress, *may be inquired of and prosecuted in any district from, through, or into which such commerce,*

*mail matter, or imported object or person moves.*

*Id.* (emphasis added).

In *United States v. Polizzi*, 500 F.2d 856, 899 (9th Cir.1974), we held that a violation of the Travel Act is a "continuing offense" under the general venue statute. Consequently, we concluded that a Travel Act offense may be prosecuted in any district " 'from, through, or into which' " the travel occurred. *Id.* (quoting 18 U.S.C. § 3237(a)).

Here, there is no dispute that Defendant began the travel that was involved in the Travel Act violation in Montana. What Defendant disputes is proof of the intent element of the statute in Montana. Defendant argues that the government did not prove that he left Montana with the intent to commit a violent act in California and, therefore, venue was improper in Montana.

■ We are not persuaded. Defendant's argument that he had no intent to beat up S.S. until he was already in California is belied by the jury's verdict. By finding him guilty on this count, the jury necessarily found that he traveled in interstate commerce from Montana through other states to California with intent to commit a crime of violence to further an unlawful activity. Defendant has not challenged the jury's substantive verdict on this count, and therefore we take it as established that when he was still in Montana, Defendant had intent to commit a crime of violence. Accordingly, venue in Montana was proper.

### 3. *The "Other Acts" Evidence*

■ Defendant's next challenge is to the admission of testimony regarding his violent assaults on his prostitute-victims. A district court's decision to admit evidence under Federal Rule of Evidence 404(b) is reviewed for abuse of discretion. However, the determination that evidence was within the scope of Rule 404(b) is reviewed

de novo. *United States v. Rrapi*, 175 F.3d 742, 748 (9th Cir.1999).

■ Evidence is not "other acts" evidence within the scope of Rule 404(b) if it is inextricably intertwined with the crime charged. *United States v. King*, 200 F.3d 1207, 1215 (9th Cir.1999); *United States v. Soliman*, 813 F.2d 277, 279 (9th Cir.1987). Evidence is "inextricably intertwined" if it "constitutes a part of the transaction that serves as the basis for the criminal charge" or "was necessary to ... permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012–13 (9th Cir.1995); *see also Rrapi*, 175 F.3d at 748–49.

■ Defendant objects primarily to "repetitive" testimony about his beating the victims. The beatings were an integral part of the transactions that constituted the crimes charged. Defendant was charged with persuading young girls to become prostitutes and transporting those young girls in interstate commerce for the purpose of prostitution. Although Defendant is correct that the violent acts were not statutory elements of proof, the assaults were the means by which Defendant maintained the necessary control over his victims so as to carry out the crimes charged. In the circumstances, the assaults were necessarily part of the transactions and therefore were inextricably intertwined.

Evidence of the assaults also allowed the government to present a coherent and comprehensible story about what took place. *See Vizcarra–Martinez*, 66 F.3d at 1012–13 (defining the "inextricably intertwined" standard). Defendant's theory of the case was that the interstate trips were a "traveling party," and at trial his counsel described the victims as teenagers who were gleefully traveling without adult su-

pervision to Disneyland, Magic Mountain, and Knott's Berry Farm. The district court did not abuse its discretion by permitting the government to refute the "traveling party" theory with testimony regarding the violent assaults that also took place.

In short, testimony about Defendant's repeated assaults on his victims was not "other acts" evidence within the limitations of Rule 404(b). " '[T]he policies underlying the rule are simply inapplicable when some offenses committed in a single criminal episode become 'other acts' because the defendant is indicted for less than all of his actions.' " *Soliman,* 813 F.2d at 279 (quoting *United States v. Aleman,* 592 F.2d 881, 885 (5th Cir.1979)). The court did not abuse its discretion in admitting the evidence.

#### 4. *The Statements Made to FBI Agent Tarpinian*

█ Next, Defendant contends that the district court erred when it denied his motion to suppress statements made to FBI Agent Tarpinian. He first argues that the statements were inadmissible because they were obtained in violation of his right to counsel. Second, he argues that his statements were involuntary. We find neither contention persuasive.

#### (a) *The Request for Counsel*

█ Defendant correctly states that *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), forbid reinitiation of an interview after a suspect requests counsel. The government argues that Defendant's statement to the FBI ("I ain't got no lawyer, man. Let me out of here.") was not an unequivocal request. *See Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (holding that a request for counsel must be unambiguous.) Defendant relies primarily

on our decision in *Robinson v. Borg,* 918 F.2d 1387 (9th Cir.1990), to support his claim that his statement was such an unequivocal request. We review de novo whether a statement is sufficient to invoke the right to counsel. *United States v. Doe,* 60 F.3d 544, 546 (9th Cir.1995)(per curiam).

However, whether Defendant unambiguously requested counsel is not the issue on this record. The district court made a factual finding that the agents terminated the interview as soon as the statement was made. That finding is not clearly erroneous and refutes Defendant's claim as a factual matter. Thus, on this record, we need not decide whether Defendant's statement was an unequivocal request for counsel. Equivocal or not, the district court found that the interview stopped immediately on Defendant's request—precisely what *Edwards* and *Minnick* require. Therefore, Defendant's right to counsel was not violated.

#### (b) *Voluntariness*

█ Defendant also asserts that his statements were involuntary. We review for clear error a district court's finding of voluntariness. *United States v. Sherwood,* 98 F.3d 402, 409 (9th Cir.1996).

The district court did not clearly err in determining that Defendant made statements voluntarily. The totality of the circumstances—both the characteristics of the accused and the details of the interrogation—supports this finding. *See Dickerson v. United States,* 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (stating standard).

Defendant, who was quite familiar with the justice system from past encounters, received *Miranda* warnings and validly waived his rights. Defendant testified that Agent Tarpinian was "a gentleman to the fullest" during the interrogation. The

interrogation lasted only about 45 to 60 minutes, and the agents did not deprive Defendant of food or other necessities. In the circumstances, the district court did not err.

### 5. *The Confrontation Clause Claim*

■ Defendant also argues that his rights under the Confrontation Clause were violated by the government's failure to provide Tarpinian's notes from the initial interview. We review de novo an alleged violation of the Confrontation Clause. *United States v. Saya*, 247 F.3d 929, 937 (9th Cir.), *cert. denied*, — U.S. ——, 122 S.Ct. 493, 151 L.Ed.2d 404 (2001).

Defendant relies primarily on *United States v. Harris*, 543 F.2d 1247 (9th Cir. 1976), but it does not support his argument. *Harris* construed statutory requirements under the Jencks Act, 18 U.S.C. § 3500, and was not a constitutional case. Moreover, even in that context, *Harris* does not go so far as to require that an FBI agent produce rough notes in every case before testifying. Rather, in *Harris* we held that the FBI's long-standing practice of routinely destroying rough notes after the notes had been condensed into a report was a usurpation of the judicial function of determining what evidence should be produced in a criminal case. 543 F.2d at 1248, 1251–53. There is no claim of routine destruction here.

■ *United States v. Pisello*, 877 F.2d 762, 768 (9th Cir.1989), clarified that whether such notes must be produced should be answered on a case-by-case basis after examining all the facts. *Pisello* does not require the production of notes when the substance of the notes has been preserved in a formal memorandum, such as a 302 report. *Id.* As in *Pisello*, Defendant here made no showing that the notes contained anything exculpatory or that the notes would have affected his trial. *Id.*

The Sixth Amendment does not guarantee that a defendant has all material that he seeks to impeach a witness. Rather, it guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam). Generally, that right is satisfied when, as in this case, the defendant had a full and fair opportunity to probe any inconsistencies in the witness' statements. *Id.* at 22, 106 S.Ct. 292. Defendant had that opportunity and took advantage of it; minor inconsistencies in Tarpinian's testimony and his final 302 report were exposed. Because Defendant had a meaningful opportunity to cross-examine Tarpinian, even without the notes, and because he has not shown the prejudice required by *Pisello*, Defendant's Confrontation Clause claim must fail.

In summary, none of Defendant's attacks on his convictions persuades us. We therefore affirm the convictions and turn our attention to the sentencing issues that he has raised.

### B. *The Sentencing Issues*

■ We review de novo the legality of a sentence and the district court's interpretation of the Sentencing Guidelines. *United States v. Reyes–Pacheco*, 248 F.3d 942, 945 (9th Cir.2001). We review for abuse of discretion the decision to depart from the Sentencing Guidelines. *United States v. Sablan*, 114 F.3d 913, 916 (9th Cir.1997) (en banc). Factual determinations pertinent to sentencing are reviewed for clear error. *United States v. Wetchie*, 207 F.3d 632, 633 n. 1 (9th Cir.), *cert. denied*, 531 U.S. 854, 121 S.Ct. 134, 148 L.Ed.2d 87 (2000).

### 1. *Erroneous Statutory Maximum*

■ Defendant correctly argues, and the government concedes, that the district

court erred in imposing a maximum sentence of 10 years for the four § 2422(a) counts: counts 2, 5, 8, and 11. At the time Defendant committed the acts underlying these counts, the maximum sentence under § 2422(a) was *five* years. In October of 1998, Congress extended the statutory maximum to *ten* years. *Protection of Children from Sexual Predators Act of 1998*, Pub.L. No. 105–314, § 102(1), 112 Stat. 2974, 2975. The district court erroneously sentenced Defendant in accordance with the amended statute, rather than the statute in place at the time the acts were committed. We reverse and remand for resentencing in accordance with the pre-amendment statutory maximum.

### 2. *The Consecutive Sentences*

Defendant was sentenced to concurrent terms for the counts involving S.S. and concurrent terms for the counts involving R.K., but with the group of terms for one victim to run consecutively to the terms for the other victim. Consecutive terms were not indicated by the Sentencing Guidelines' grouping provisions. *See* U.S.S.G. § 5G1.2. The government argues that the consecutive terms were properly imposed as upward departures because of Defendant's extensive criminal history and his abuse of his victims. Defendant argues that he lacked notice of the district court's intention to impose consecutive sentences and that the imposition of consecutive sentences was therefore inappropriate. Defendant is correct.

■■■ Under the Sentencing Guidelines, the district court retains its statutory discretion to impose consecutive sentences. *United States v. Wills*, 881 F.2d 823, 827 (9th Cir.1989). Title 18 U.S.C. § 3584 confers discretion on the district court as to whether to impose a consecutive or a concurrent sentence. 18 U.S.C. § 3584.[2] Section 5G1.2 of the Sentencing Guidelines instructs the district court, in general, about when concurrent or consecutive sentences are appropriate when sentencing a defendant on multiple counts. Harmonizing this guideline with § 3584, we have determined that consecutive sentences are permissible even when not indicated by the Sentencing Guidelines as a *departure*. *United States v. Pedrioli*, 931 F.2d 31, 32 (9th Cir.1991).

■■■ A district court can depart upward only if the defendant has received notice that a departure is being contemplated and of the specific grounds on which the district court departs. *See* Fed. R.Crim.P. 32; *Burns v. United States*, 501 U.S. 129, 135, 138–39, 111 S.Ct. 2182, 115

---

**2.** 18 U.S.C. § 3584 states:

(a) Imposition of concurrent or consecutive terms.—If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively, except that the terms may not run consecutively for an attempt and for another offense that was the sole objective of the attempt. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively. Multiple terms of imprisonment imposed at different times run consecu-

tively unless the court orders that the terms are to run concurrently.

(b) Factors to be considered in imposing concurrent or consecutive terms.—The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a).

(c) Treatment of multiple sentence as an aggregate.—Multiple terms of imprisonment ordered to run consecutively or concurrently shall be treated for administrative purposes as a single, aggregate term of imprisonment.

L.Ed.2d 123 (1991). This notice can come from the district court itself, or from the presentence report or a prehearing submission from the government. *Id.* In addition, specific notice is required before a district court can depart through the mechanism of consecutive sentences. *See United States v. Brady*, 928 F.2d 844, 847 (9th Cir.1991), *abrogated in part on other grounds by Nichols v. United States*, 511 U.S. 738, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994). In *Brady* we held that the defendant "should have been notified before sentencing that the court intended" (1) to depart upward on various grounds, *and* (2) "to run the sentences consecutively rather than concurrently." As for any departure, this notice can come from the district court, the presentence report, or a prehearing submission from the government.

■ The district court erred in this case for two reasons. First, Defendant did not have notice of all the grounds for departure. Both extensive criminal history and the defendant's "physical, sexual, and emotional abuse" of the victims can be acceptable grounds for departure. *See* U.S.S.G. §§ 4A1.3, 5K2.8. However, the presentence report in this case mentioned only the latter of these grounds, and neither the district court nor the government provided Defendant with notice of the former. Second, Defendant did not have notice that the district court might depart through the mechanism of consecutive sentences. Although the government stated its intent to seek consecutive sentences in its objections to the presentence report, it did not speak in terms of a departure, and

the probation officer's supplemental addendum to the presentence report did not specifically identify the mechanism of consecutive sentences. Defendant was under the impression that the government sought consecutive sentences *under* the Guidelines, rather than as a *departure* from the Guidelines, and accordingly correctly argued at sentencing that the Guidelines' grouping provisions do not provide for consecutive sentences in this case.

■ By relying on a ground and utilizing a departure mechanism of which Defendant did not have prior notice, the district court erred. We cannot be certain on this record whether the district court would have departed in the way that it did had it considered only the ground specified in the presentence report—Defendant's extreme conduct.[3]

We therefore vacate Defendant's sentence and remand for resentencing. On resentencing, the district court must ensure that Defendant has received notice of all grounds on which a departure is contemplated and that the departure may be accomplished through the mechanism of consecutive sentences. Further, the district court will have to take into account the lower statutory maximums for counts 2, 5, 8, and 11 if it decides to impose consecutive sentences.

### 3. *The Criminal History Computation*

Defendant makes several arguments contesting the computation of his criminal history score. We have determined that Defendant's criminal history score was indeed miscalculated by one point.[4]

---

3. The record supported a departure on this ground. Defendant trapped one of his victims in a zippered bag, taking her back to a hotel where he beat her for more than two days. He forced both victims to engage in rough sex with him. He threatened both victims with more violence if they did not meet their nightly "quotas." This is the kind of

"extreme conduct" that U.S.S.G. § 5K2.8 describes as a ground for departure because it is "unusually heinous, cruel, brutal, or degrading to the victim."

4. Defendant's total criminal history score of 12 points was calculated as follows:

In the main, Defendant contests the number of points awarded for juvenile offenses. Two juvenile offenses contributed to Defendant's score.[5] In October of 1989, Defendant was sentenced to 8 to 12 weeks in juvenile detention for delivering cocaine. In July of 1992, Defendant was convicted of aggravated assault. For that offense, he was committed to juvenile detention until his nineteenth birthday.

Criminal history is calculated by totaling points awarded according to U.S.S.G. § 4A1.1(a) through (f). That section must be read together with § 4A1.2, which contains definitions and instructions for computing the criminal history score. U.S.S.G. § 4A1.1, cmt. Section 4A1.2(d) determines how juvenile convictions are counted. Section 4A1.2(d) states, in pertinent part:

(1) If the defendant was convicted as an adult and received a sentence of imprisonment exceeding one year and one month, add 3 points under § 4A1.1(a) for each such sentence.

(2) In any other case,

(A) add 2 points under § 4A1.1(b) for each adult or juvenile sentence to confinement of at least sixty days if the defendant was released from such confinement within five years of his commencement of the instant offense[.]

- Two points for a juvenile conviction for delivery of cocaine;
- Three points (which we now hold should have been only two) for a juvenile conviction for aggravated assault;
- One point for a 1995 adult firearm conviction;
- One point for a 1996 conviction for driving under the influence;
- One point for a 1998 criminal mischief conviction;
- One point for a 1998 assault;
- Two-point adjustment awarded under U.S.S.G. § 4A1.1(d) because the instant offense was committed while Defendant was on probation;

Defendant was awarded two points for his cocaine conviction and three points for his aggravated-assault conviction. The two points for the cocaine conviction were proper under § 4A1.1(b), as § 4A1.2(d)(2)(A) instructs. Under those sections, Defendant's aggravated-assault conviction should also have been calculated as two points.

For both offenses, Defendant served time in juvenile detention. Juvenile detention is a "sentence to confinement" under § 4A1.2(d)(2)(A). *United States v. Williams*, 891 F.2d 212, 216 (9th Cir.1989).

Also in both cases, the sentence was for "at least 60 days," as required by both § 4A1.2(d)(2)(A) and § 4A1.1(b). The aggravated-assault conviction resulted in a sentence of more than two years. Even though the cocaine-delivery sentence was only for 8 to 12 weeks, the relevant term is "the maximum sentence imposed." U.S.S.G. § 4A1.2(b)(1). Although § 4A1.2(b)(1) refers specifically to a term of "imprisonment," rather than a term of "confinement," as does § 4A1.2(d)(2)(A), we see no reason to apply a different definition. Because the maximum imposed—12 weeks—is at least 60 days, this element is met here. U.S.S.G. § 4A1.2, cmt. n. 2.

- One-point adjustment awarded under § 4A1.1(e) because Defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under § 4A1.1(a) or (b). (This adjustment refers to the conviction for aggravated assault.)

5. Although these are the only two juvenile offenses that contributed points toward Defendant's criminal history score, they are *not* the only two juvenile offenses in Defendant's criminal history. Defendant committed other juvenile offenses, including promoting prostitution, that were not counted toward the final total.

Additionally, Defendant was released from confinement for both juvenile offenses within five years of Defendant's "commencement of the instant offense." U.S.S.G. § 4A1.2(d)(2)(A). Application note 8 to § 4A1.2 makes clear that the commencement of the instant offense includes all "relevant conduct." U.S.S.G. § 4A1.2, cmt. n. 8. Relevant conduct is broader than the conduct that subjects Defendant to criminal liability. U.S.S.G. § 1B1.3, cmt. n. 1. Here, the "relevant conduct" began in the fall of 1994 when Defendant began training S.S. in Billings. Defendant was released from the cocaine-delivery sentence on · December 6, 1989, and from the aggravated-assault sentence on January 26, 1993. Both dates are within the five years preceding the fall of 1994, when relevant conduct for this offense began.

Finally, Defendant challenges the inclusion of his August, 1998 adult conviction for criminal mischief. Section 4A1.2(c)(1) lists offenses that generally do not contribute to a criminal history score unless the sentence imposed was a term of probation of at least one year or a term of imprisonment of at least 30 days. Defendant claims that his conviction for criminal mischief is similar to disorderly conduct, one of the crimes listed in § 4A1.2(c)(1).

However, Defendant was sentenced to six months, suspended, for the criminal mischief conviction. Thus, it is irrelevant whether criminal mischief is similar to disorderly conduct because the sentence imposed takes the conviction out of the exclusion in § 4A1.2(c)(1). Even though the sentence was suspended, the definition of "prior sentence" in the Guidelines includes suspended sentences for convictions that receive one criminal history point each. U.S.S.G. §§ 4A1.1(c), 4A1.2(a)(3). *See United States v. Hernandez*, 160 F.3d 661, 671 (11th Cir.1998). The criminal mischief conviction was properly counted.

The aggravated-assault sentence should have been counted as two points under § 4A1.2(d)(2)(A). Defendant's criminal history score was thus miscalculated by one point. Under the erroneous computation, Defendant received 12 points, placing him in Criminal History Category V. However, Criminal History Category V is assigned to those who score 10, 11, *or* 12 points. Defendant's correct score was 11.

This error is harmless because it does not change Defendant's Criminal History Category. Therefore, Defendant is not entitled to any relief on account of this mistake. *United States v. Sanders*, 41 F.3d 480, 487 (9th Cir.1994). Nonetheless, because we remand for resentencing on different and independent grounds, the district court should make this correction.

### 4. The Enhancements for Victim Vulnerability and Physical Force

Finally, Defendant challenges the enhancements that the district court applied for victim vulnerability and physical force.

#### (a) Vulnerable Victims

We consider first the vulnerable-victim enhancement. The district court increased Defendant's offense level on all counts because it found that both victims, S.S. and R.K., were vulnerable. *See* U.S.S.G. § 3A1.1(b)(1). The application notes to U.S.S.G. § 3A1.1 state that the enhancement for targeting a vulnerable victim is not appropriate "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age." U.S.S.G. § 3A1.1, cmt. n. 2. We have applied that principle to Mann Act victims. "If the factor that makes the victim vulnerable is not 'unusu-

al' for victims of the offense, the § 3A1.1(b) enhancement is not permitted." *United States v. Castaneda*, 239 F.3d 978, 981 (9th Cir.2001).

In *Castaneda*, we reversed the application of the enhancement to a sentence imposed for violations of the Mann Act. The district court had applied the enhancement because of the economic vulnerability of the victims in that case. *Id.* at 980. However, we reversed because economic vulnerability is not uncommon in Mann Act victims. *Id.* at 981–82. We adopted the reasoning from *United States v. Sabatino*, 943 F.2d 94, 103 (1st Cir.1991), and held that, in order for the vulnerable-victim enhancement to apply to Mann Act offenses, the victim must be vulnerable to a degree beyond that already contemplated by the offense.

Nonetheless, the enhancement for victim vulnerability still is appropriate if the district court makes a finding of unique vulnerability in the circumstances. For example, *Castaneda* distinguishes *Johnson*. 239 F.3d at 981 n. 5. In ruling that the vulnerable-victim enhancement was appropriate, *Johnson* listed several factors that supported a finding of particular vulnerability. *Id.* at 1285–86. The defendant in *Johnson* targeted a foreign exchange student from Norway for whom he was a host-parent. Because the student had traveled to America from a small Norwegian town, because the defendant had been charged with his care, and because the minor knew no one else in the area, we held that the vulnerable-victim ·enhancement was appropriate. *Id.*

The factual findings related to vulnerability here were not clearly erroneous. *See Wetchie*, 207 F.3d at 633 n. 1 (stating that a finding of victim vulnerability is reviewed for clear error). However, we still must decide whether the application of the enhancement was permissible, as in *Johnson*, or inapplicable because the vic-

tims were "typical" Mann Act victims, as in *Castaneda*.

■ In this case, the vulnerable-victim enhancement was appropriate for the counts involving S.S. The district court made findings as to S.S.'s unusual vulnerability. The district court found that S.S. was particularly vulnerable because of her "mental condition," which followed from the facts that she had been raped by her mother's boyfriend when she was seven and that her mother had a serious problem with chemical dependency. The court concluded that S.S.'s particular psychological make-up made her more vulnerable to Defendant than another Mann Act victim might have been. Therefore, as to S.S., the adjustment is permissible.

■ However, the adjustment as to R.K. cannot be reconciled with *Castaneda*. The district court found that the instability of R.K.'s personal life and her own chemical dependency made her "particularly vulnerable to the pimps who forced her to work as a prostitute." As far as the record discloses, those characteristics are typical among Mann Act victims and, without more, cannot support the application of § 3A1.1. The district court made no findings of unusual vulnerability beyond R.K.'s status as a drug-addicted teenage runaway. Nor did the district court make any findings as to R.K.'s relationship with this Defendant and his potential exploitation of that vulnerability. In the absence of such findings, we cannot sustain the enhancement.

Because the district court made findings as to S.S.'s atypical vulnerability, the vulnerable-victim enhancement is proper as to counts 2, 3, 5, 6, 8, 9, and 10. We reverse the use of that enhancement as to counts 11 and 12, involving R.K., and remand for such further proceedings as the district court may deem appropriate.

### (b) Physical Force

Next, we turn to physical force. The district court applied a four-level enhancement to all counts, *see* U.S.S.G. § 2G1.1(b)(1), because the offenses are prostitution offenses that "involved . . . the use of physical force, or coercion by threats or drugs or in any manner." Defendant challenges the enhancement as applied to the two counts involving R.K. In doing so, he reads the word "offense" narrowly, arguing that because the actual travel from Montana to New Mexico did not involve physical force, the adjustment was improper. His narrow focus is incorrect.

 The district court found that Defendant used physical force as a means of control over R.K. in order to ensure her continued participation in prostitution activity. That factual finding is supported by the record. Moreover, that is precisely the conduct that the adjustment is aimed at punishing.

We reject Defendant's argument that physical force must play a role in each element of the Mann Act counts in order for the adjustment to be appropriate. As the Fifth Circuit noted in *United States v. Campbell*, 49 F.3d 1079, 1085–86 (5th Cir. 1995), the plain words of the adjustment require only that the offense *involve* physical force. Here, as in *Campbell*, Defendant used force to control young girls in connection with an interstate prostitution scheme. *Id.* As in *Campbell*, the adjustment is appropriate even though physical force was not used only to "coerce," or only to "transport," but also to allow Defendant to intimidate his prostitutes and ensure their continued participation. *Id.* Because the violence occurred to further the overall prostitution scheme, the offense "involved" physical force. On that ground, we affirm the adjustment.

Convictions AFFIRMED, sentence VACATED, and case REMANDED for re-sentencing in a manner consistent with this opinion.

GRABER, Circuit Judge, specially concurring:

I agree with the majority's analysis except in one respect: the holding that separate, specific notice is required before a district judge may depart through the imposition of consecutive sentences. Accordingly, I concur specially.

There are four reasons why I disagree with the majority's holding concerning notice of contemplated consecutive sentences. (1) The holding of *United States v. Brady*, 928 F.2d 844 (9th Cir.1991), *abrogated in part on other grounds by Nichols v. United States*, 511 U.S. 738, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994), has been vitiated by a later Supreme Court decision and by a clarifying decision from this court. (2) The majority's logic is inconsistent with the clear holding of our other cases that consecutive sentences are merely a form of departure, not a separate species. (3) There is no policy justification for the majority's holding. (4) Because Defendant had notice of the possibility of consecutive sentences, before the sentencing hearing took place, he is not entitled to any relief even under the majority's theory. I will discuss each of those reasons in turn.

First, in the light of subsequent cases, *Brady* does not control. Two cases decided shortly after *Brady* undercut the text on which the majority relies: *United States v. Pedrioli*, 931 F.2d 31 (9th Cir. 1991), and *Burns v. United States*, 501 U.S. 129, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991).

The *Brady* panel erred when it failed to follow the rule that this court had announced in *United States v. Wills*, 881 F.2d 823 (9th Cir.1989): despite § 5G1.2's mandatory text regarding consecutive versus concurrent sentences, consecutive sen-

tences are permissible under the Guidelines as a departure. By contrast, *Brady* described the Guidelines' position on consecutive versus concurrent sentences as if it were absolute. 928 F.2d at 849–50. After *Brady, Pedrioli* reaffirmed the rule established in *Wills* and held that the district court may exercise its discretion under § 3584 and impose consecutive sentences *as a departure* when sentencing a defendant on multiple counts—even when the Guidelines would "require[ ] . . . sentences to overlap." *Pedrioli*, 931 F.2d at 32.[1] *Pedrioli* distinguished *Brady* to harmonize it with *Wills* and limit it to its facts:

> [*Brady* ] does not change this rule. While *Brady* reversed a district court's imposition of consecutive sentences, it did so because the district court's departure from guideline practice was unexplained and "unreasonable," not because the district court lacked authority to depart from the guidelines and impose consecutive sentences.

*Pedrioli*, 931 F.2d at 32 n. 1.

*Pedrioli* identified "the difficult question" as "whether a district court is obliged to follow *the usual procedures for departing from the guidelines* when it elects to use its discretion under § 3584(a) to diverge from the guideline's recommendations." *Id.* at 32 (emphasis added). *Pedrioli* answered that question in the affirmative: As long as the district court follows the "usual" departure procedures, electing consecutive sentences over concurrent sentences for multiple counts is within the court's discretion. *Id. Pedrioli* explicitly described the procedural steps that a district court must follow before

departing through the mechanism of consecutive sentences. The court did not include any special notice requirements as to the *mechanism* of the departure, as distinct from the *reasons* for the departure:

> The guideline procedures for departure require that the district court specify the ground for its decision on the record, that the court make accurate findings of fact as to that ground, that the ground for departure be based on reasonable factors not considered by the guidelines, and that the extent of the departure be reasonable.

*Id.* at 32 n. 2. Thus, *Pedrioli*—which postdated and severely limited *Brady*—emphasized that the notice requirements concern the substantive *reasons* for the departure, not the *means* by which the departure is imposed.

A few months after this court decided *Pedrioli*, the United States Supreme Court issued its opinion in *Burns*. There, the Supreme Court defined the notice requirements for departing from the Sentencing Guidelines. Construing Federal Rule of Criminal Procedure 32(a)(1), the Court held that "Rule 32 requires that the district court give the parties reasonable notice that it is contemplating" a departure and that the district court "must specifically identify the ground on which" it is considering the departure. *Burns*, 501 U.S. at 138–39, 111 S.Ct. 2182. The Court recognized that Rule 32 requires an informed adversarial process and emphasized that notice of the substantive ground for the contemplated departure was necessary. *See id.* at 136–37, 111 S.Ct. 2182 (stating that, "[b]ecause the Guidelines place essen-

---

1. Other circuits that have considered this issue agree. *United States v. Bradford,* 246 F.3d 1107, 1114 n. 3 (8th Cir.2001) (per curiam); *United States v. Hui,* 83 F.3d 592, 593–94 (2d Cir.1996) (per curiam); *United States v. Quinones,* 26 F.3d 213, 217 (1st Cir.1994); *United States v. Perez,* 956 F.2d 1098, 1103 (11th Cir.1992) (per curiam); *United States v. Martinez,* 950 F.2d 222, 226 (5th Cir.1991); *United States v. Stewart,* 917 F.2d 970, 973 (6th Cir.1990).

tially no limit on the number of potential factors that may warrant a departure, no one is in a position to guess when or on what grounds a district court might depart"). As we had done in *Pedrioli*, the Court concerned itself with the substantive reasons underlying a departure decision. However, *Burns* did not require special notice for a particular departure mechanism. Notably, too, the Court in *Burns* did not suggest that the *extent* of the contemplated departure was a separate subject of the required notice, nor does Rule 32 suggest this result independently. The effect of the majority's holding is to read into Rule 32 and *Burns* an additional notice requirement for the mechanism and the extent of a potential departure.

Read together, *Pedrioli* and *Burns* establish that notice of the substantive ground for departure is the only procedural safeguard that must be followed before a district court departs from the Guidelines. Once the district court informs the parties of its intent to depart and of the substantive grounds underlying that intent, the parties can prepare adequately for the sentencing hearing. With substantive notice, the parties have the meaningful opportunity, afforded by Rule 32 and the Court's interpretation of it in *Burns*, to convince the district court to adhere to the Guidelines instead of departing. Additional notice of the specific mechanism or extent contemplated does not make that opportunity any more meaningful.

Second, defining different requirements for this particular form of departure undermines the logic of *Wills* and *Pedrioli*. Those cases managed to harmonize a serious potential conflict: Section 5G1.2 of the Guidelines clearly mandates consecutive sentences or concurrent sentences in certain circumstances, but § 3584 just as clearly leaves the decision to the district court in its discretion. *Wills* and *Pedrioli* fit those provisions together by classifying the imposition of consecutive or concurrent sentencing as a garden-variety departure. Creating a special notice requirement for one form of departure revives the tension that *Wills* and *Pedrioli* resolved.

Third, requiring the district court to take an additional step in the sentencing process unnecessarily complicates Guidelines procedures. When a district court contemplates any departure, it contemplates leaving the Guidelines sentence behind. As long as the parties are informed of the substantive grounds for the contemplated departure, they have the information they need to prepare effectively their evidence and arguments for or against adherence to the Guidelines.

The majority's holding also creates an ambiguity that will affect many, if not all, sentencing hearings in which the district court contemplates the possibility of a departure. It is not correct to say that a departure is necessarily larger or more significant just because it is in the form of consecutive sentences.[2] If the point of a separate notice is to alert the defendant to the potential for a *big* departure, then that logic applies equally any time the district court is considering a significant departure. The practical result will be to require notice of the proposed extent of the departure in many cases, but to create

---

**2.** For example, suppose that a defendant is convicted of three crimes. Assume that the Guidelines sentence for Crimes 1 and 2 is 72 months each, while the Guidelines sentence for Crime 3 is 24 months. District Judge X decides to depart by keeping each sentence within the Guidelines but having the sentence for Crime 3 run consecutively to the sentences for Crimes 1 and 2 (which will run concurrently), for a total of 96 months. District Judge Y decides to depart upwardly by 24 months for Crimes 1 and 2, to adhere to the Guidelines for Crime 3, and to run all sentences concurrently, again for a total of 96 months. There is no principled reason to give a different notice in those two situations.

confusion as to just which departures are significant enough to require separate notice.[3]

Fourth and finally, creating a separate-notice rule is not necessary on this record. *Burns* does not require that the district court deliver notice of a potential ground for departure. Instead, *Burns* recognizes that, normally, the defendant and the government will have notice of a potential ground for departure either in the presentence report (PSR) or in the government's sentencing recommendations. *Burns*, 501 U.S. at 135, 111 S.Ct. 2182. Only in the "extraordinary" case in which the district court, "on its own initiative and contrary to the expectations of both the defendant and the Government," wants to depart for a particular reason is the district court required to notify the parties of its inclination. *Id.*

Here, Defendant had specific notice of the possibility not only of a departure, but also of a departure by means of a consecutive sentence. The PSR stated that Defendant's extreme conduct may warrant a departure under § 5K2.8. In its objections to the PSR, the government encouraged the district court to depart through the

imposition of consecutive sentences. Defendant received the government's objections and responded specifically to the government's argument for consecutive sentences.

After considering both arguments, the district court chose to depart upward by imposing consecutive sentences. I would decline to extend *Burns* to require any additional form of notice beyond that provided in the PSR and the government's objections simply because the district court chose to depart by imposing consecutive sentences, rather than by increasing the length of the prescribed sentence for each separate crime. As long as the district court departed on the ground specified in the PSR—"extreme conduct"—the notice requirements of *Burns* and Rule 32 were satisfied.

Despite my disagreement with the majority's holding that requires separate notice of a possible departure by means of consecutive sentences, I concur in the result on this issue. Defendant had notice of only one substantive ground for departure—"extreme conduct."[4] Because the district court departed on an additional, unspecified, substantive ground (§ 4A1.3,

**3.** Past experience proves that the question of a departure's significance is not easily answered. In 1991, an en banc court decided that, generally, sentencing factors must be established by a preponderance of the evidence. *United States v. Restrepo*, 946 F.2d 654, 659 (9th Cir.1991) (en banc). However, we recognized a possible exception for factors that have an "extremely disproportionate effect" on the sentence relative to the crime of conviction. *Id.* More than 10 years later, our circuit still struggles to decide whether a particular sentencing factor has such an "extremely disproportionate effect." *See, e.g., United States v. Romero–Rendon*, 220 F.3d 1159, 1161 (9th Cir.) (noting "uncertainty in this circuit as to when the higher burden of proof applies"), *cert. denied*, 531 U.S. 1043,

121 S.Ct. 640, 148 L.Ed.2d 546 (2000); *United States v. Jordan*, 256 F.3d 922, 934–35 (9th Cir.2001) (O'Scannlain, J., concurring) (describing years of confusion regarding when the higher burden of proof applies).

**4.** The district court did not give the parties any notice, beyond that provided by the PSR, that it was contemplating any other ground for departure. *Compare United States v. Hernandez*, 251 F.3d 1247, 1252 (9th Cir.), *amended by* 280 F.3d 1216 (9th Cir.2001) (holding that notice was adequate where grounds were not included in the PSR but the district court informed the defendant, at the beginning of the sentencing hearing, of an intention to depart).

extensive criminal history), I agree that we must remand for resentencing.