In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-2839

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SUSAN COSTELLO,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:98-CR-150—**James T. Moody**, *Judge.*

ARGUED SEPTEMBER 6, 2002—DECIDED SEPTEMBER 26, 2002

Before POSNER, EASTERBROOK, and DIANE P. WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* The defendant was convicted of conspiracy to violate, and of violating, 18 U.S.C. § 1952(b), which makes it a federal crime to use the mails, or instrumentalities of interstate commerce, to commit offenses relating to prostitution that are criminal under the law of the state in which the offenses were committed. The federal sentencing guidelines provide for a four-level increase in the defendant's base offense level "if the offense involved (A) prostitution and (B) the use of physical force, or coercion by threats or drugs or in any manner." U.S.S.G. § 2G1.1(b)(1). The judge found use of physical force and

sentenced defendant to 70 months in prison; had he not found use of physical force, the maximum sentence would have been, by our calculations, only 57 months. We must decide whether the force or other coercion must be directed against a prostitute, and, if so, whether the district court's imposition of the four-level increase can stand. The defendant presents additional issues, but we have considered and rejected them and they lack sufficient merit to warrant discussion.

The conspirators operated adjacent bars that offered striptease shows. During intervals between the shows, the striptease dancers would sit with the patrons of the bars, and if the patrons wanted would have sex with them, either in the basement beneath one of the bars or in the motel in which the other bar was located, for a price. Thus the dancers doubled as prostitutes. One of the bars employed a bouncer named Dave Brown who was prone to violence. Once, when a customer called one of the prostitutes a foul name (spelled "fowl" in the transcript), Brown "bashed [the customer's] head into the jukebox and threw him out the door." Another time, when the bar caught fire, Brown shot at a man (presumably the suspected arsonist) who drove away in a truck. On still another occasion Brown pulled a gun "when Christina [one of the prostitutes] was climbing in a truck and the trucker wouldn't stop." Obviously these were uses of physical force, but they were not directed against the prostitutes and indeed the first and probably the third and possibly the second as well were in defense of the prostitutes. There was also however evidence that Brown once kicked a chair as a joke and one of the prostitutes, who was drunk, "took it a little bit overboard," and Brown "put the chair on her throat and was choking her." The defendant describes this enigmatic incident as just horsing around. There was also evidence that the conspirators sometimes

searched the prostitutes' lockers (but surely this doesn't amount to the use of physical force or coercion in any sense relevant to the guideline) and conducted strip searches of the prostitutes, though when and for what purpose and whether it was connected with their services as prostitutes—for they were also dancers—is not indicated.

The judge in his very brief statement in regard to the increase in the base offense level on account of physical force did not distinguish between the use of force against the prostitutes and against others. All he said was that "it was reasonably foreseeable by [the defendant] that Mr. Brown certainly was a bouncer, and bouncers' duties include keeping patrons and employees who were the dancers and the prostitutes in line." The judge apparently gave no weight to the strip searches or the locker searches, though these are mentioned by the government in its brief; he just refers to the use of force by the bouncer. The presentence report has a little more on force: "a Cooperating Witness (CN) advised FBI agents that Brown would rough up some of the girls that worked in the clubs. If a girl was a good money maker for the club and the girl tried to quit, Brown would hurt them in some way. Having Brown hurt the girls was Costello's way of trying to keep them employed." But the government's brief does not mention this evidence and there is no indication that the judge credited or even considered it. Whether the judge accepted or rejected the defendant's argument that Brown's choking the prostitute was in fun is unclear, and his stating that bouncers' duties include keeping patrons as well as employees in line suggests that he believed it a matter of indifference whether force was directed at customers or at the prostitutes. He may have given no weight at all to the choking incident, about which there is nothing more in the record than we have mentioned, and based the four-level increase on the undoubted fact that Brown

roughed up one customer, drew a gun on another occasion, and actually fired at someone on still another occasion. So the question whether the guideline has reference to force directed against someone other than the prostitutes used in the conspiracy is critical to whether the judge's ruling can be upheld.

The question has not arisen in previous cases, though it may be significant that all of them involved the use of force or other coercive methods against the prostitutes themselves, not against patrons or other third parties. See *United States v. Williams*, 291 F.3d 1180, 1197 (9th Cir. 2002) (per curiam); *United States v. Evans*, 272 F.3d 1069, 1097 (8th Cir. 2001); *United States v. Anderson*, 139 F.3d 291, 297-98 (1st Cir. 1998); *United States v. Campbell*, 49 F.3d 1079, 1085-86 (5th Cir. 1995); *United States v. Sabatino*, 943 F.2d 94, 102-04 (1st Cir. 1991). The court in *Williams* terms the use of "physical force as a means of control over R.K. in order to ensure her continued participation in prostitution activity . . . precisely the conduct that the adjustment is aimed at punishing," 291 F.3d at 1197, and we think this is correct. The examples in the application notes to the guideline are limited to such cases, see U.S.S.G. § 2G1.1 Application Note 2, and the history and logic of prostitution offenses argue strongly for the limitation. Prostitution is a business, and when carried on as is common in conjunction with striptease dancing—the dancers providing a thin cover for the activity and also advertising their charms to the customers—involves an employment relation between the prostitutes and the managers of the business. But since it is an illegal business (section 1952 is confined to illegal prostitution, and so would not apply to prostitution in the handful of counties in Nevada in which brothels are legal), employers cannot use the law of contracts to control the behavior of their employees. The tendency is to substitute force, the hope being that the persons against

whom the force is being used or threatened, namely the prostitutes, will be reluctant to complain to the police since they are themselves engaged in a criminal activity. The guideline in question defines in effect an aggravated form of the prostitution offense that occurs when the ringleaders resort to force to keep the prostitutes in line.

Defined more broadly, for example to include roughing up unruly customers, the guideline would have the paradoxical effect of increasing the risks to prostitutes. After all, it is not only their employers, but also their customers, who, knowing that prostitutes, engaged as they are in an illegal activity, are unlikely to complain to the police, are more likely than is normal to use force against them. The ordinary law of property permits a property owner, including a business establishment, to use gentle force ("molliter manus imposuit"—literally, he placed his hands gently) to expel a person who refuses without right to leave the premises when told to do so. See, e.g., *Billingsley v. Stockmen's Hotel, Inc.*, 901 P.2d 141, 145 (Nev. 1995). The use of such force would come within the literal terms of the guideline if the government's position were correct. That makes very little sense that we can see. But even if the government limited its position (as surely it should) to a degree of force or method of coercion that an ordinary businessman would be forbidden to employ in defense of his property, the mere fact that the bouncer who goes too far works for a bar that is also a brothel does not make the prostitution offenses committed there aggravated offenses, for encountering an ungentle bouncer is an ordinary risk of patronizing a bar, rather than anything special to prostitution.

So the sentence must be vacated and the case remanded for reconsideration of the four-level increase. Since the strip searches may resurface in the remand, we caution

the district judge about assuming that they are coercive per se. They are not, any more than being ejected from a bar by a bouncer who uses only gentle force is. There are some jobs, for example diamond mining, in which strip searches are reasonably employed to prevent theft by employees. Prostitution is not one of them; but it is possible that the conspirators were concerned about their employees' dealing in drugs on the side, rather than bent on trying to intimidate and control them. A further complication is that the conspirators were running a bar and striptease parlor as well as a brothel, and the strip searches may have been connected to the facets of their business that were not prostitution. That is another matter to be taken up on remand. In all other respects the judgment is affirmed.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*